IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

BROWN V. BROWN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

EDWIN F. BROWN, APPELLANT,
V.
DELANA L. BROWN, APPELLEE.

Filed November 19, 2013.    No. A-13-191.

Appeal from the District Court for Lancaster County: PAUL D. MERRITT, JR, Judge.
Affirmed.

Stephanie R. Hupp and Zachary L. Blackman, of McHenry, Haszard, Roth, Hupp, Burkholder & Blomenberg, P.C., L.L.O., for appellant.

Terrance A. Poppe and Benjamin D. Kramer, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellee.

MOORE, PIRTLE, and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Edwin F. Brown appeals from the decree entered by the district court for Lancaster County, which decree dissolved his marriage to DeLana L. Brown. Edwin challenges numerous findings by the court, including custody, parenting time, child support, division of tax dependency exemptions, division of childcare expenses, division of the marital estate, and failure to award Edwin alimony and attorney fees. We find no merit to these assigned errors, and we affirm the decree.

## II. BACKGROUND

Edwin and DeLana were married on May 8, 2004. The parties had two children during their marriage, Vicente Brown, born in 2006, and MariElena Brown, born in 2008. When the parties separated on January 29, 2012, DeLana and the children left the marital residence and

- 1 -

lived with her parents. Edwin continued to live in the marital home until mid-April. On April 15, Edwin moved to a different residence, and DeLana and the children returned to the marital home, where they continued to reside at the time of trial. DeLana made the debt payments on the residence after the separation.

On February 13, 2012, Edwin filed the operative complaint for dissolution of marriage in the district court.

On March 16, 2012, the district court entered an order for temporary custody, child support, and parenting time. The court awarded DeLana temporary custody of the children, and it ordered Edwin to pay temporary child support of $170 per month. For purposes of calculating temporary child support, the court imputed monthly income to Edwin of $1,257 ($7.25 per hour and 40 hours per week). The court awarded Edwin parenting time every other week from 7 a.m. Thursday to 5 p.m. Friday, and every other week from 6 p.m. on Sunday to 8 a.m. Wednesday.

Trial was held before the district court on July 17 and August 9, 2012. The court received various exhibits into evidence and heard testimony from the parties, several character witnesses, DeLana's supervisor, an individual who plays in a band with Edwin, and a district manager for the insurance company with which Edwin's business is affiliated. We have summarized the evidence below and have set forth additional details as necessary in the analysis section of this opinion.

DeLana was 33 years old at the time of trial. She obtained her bachelor of science degree in nursing in 2002 and expected to obtain her master of science in nursing in October 2012. DeLana works as a registered nurse in the neonatal intensive care unit at a hospital in Lincoln. DeLana earns approximately $28 an hour and generally works 36 hours a week. She works 4 days a week with varying hours each day. On Mondays, DeLana works either from 8 a.m. until 4 p.m. or from 7 a.m. until 3 p.m., depending on whether the children are with her. On Tuesdays, DeLana works from 7 a.m. until 7 p.m.; she occasionally attends meetings on Wednesdays from noon until 2 p.m.; and on Thursdays, she works from 7 p.m. until 7 a.m. At the time of trial, DeLana did not have daycare expenses. Since the parties' separation, DeLana has used her parents to help her with her daycare needs.

Edwin was 35 years old at the time of trial. He graduated from college in 2000 with a bachelor's degree in business administration. Thereafter, Edwin worked as team leader of guest relations at a discount department store from 2000 to 2002, where his annual salary was $34,000 in his first year and $36,000 in his final year. From 2002 to 2004, Edwin worked as a personal banker and earned an annual salary of $32,000 in his first year and $34,000 in his final year. In 2004, Edwin accepted a job at an insurance company as a senior recruiter where he worked until 2007, earning a salary of $42,000 in his first year and $47,000 in his final year. In 2007, Edwin began working in the human resources department of a developmental services company and worked there for 8 months, earning $62,000 per year. At the same time, Edwin also worked for another insurance company in the district office, where he earned approximately $8,000 in 2007.

In late 2007, Edwin started his own insurance agency, where he still worked as an insurance agent at the time of trial. At the time of trial, Edwin was the only employee of his insurance agency. When Edwin does not have parenting time with the children, his hours vary, but he generally works 5 days a week from 8 or 9 a.m. until 6 or 8 p.m. On weeks when Edwin has the children, he maintains a similar schedule, except that he works from home 2 days a week,

so that he only has to send the children to daycare for 2 days. Edwin's monthly living expenses exhibit shows that his childcare expenses for the summer months were $738.36 per month and for the school year were $498.75 per month; however, it is not clear from the record whether the amounts listed were before or after he began working from home when he has the children.

Determining Edwin's actual income at his insurance agency was a major issue at trial. He does not receive a salary; rather, his income is based solely upon commissions from new policies and renewal premiums. At the time of the temporary custody hearing, Edwin represented to the district court that his income was $427 per month. The parties' tax returns show business losses attributable to Edwin's insurance business of $18,845 in 2008; $20,582 in 2009; and $99 in 2010. At the time of trial, Edwin had not yet filed his 2011 tax return. Edwin's district manager testified at trial that Edwin earned $48,283.99 in commissions and bonuses in 2009; $53,802.12 in 2010; and $44,102.49 in 2011. Through July 2012, Edwin had earned $32,525.12.

Edwin also is the lead singer of a local band. The band performs at least one or two nights on three weekends per month, usually on Friday and Saturday nights and only occasionally on Sunday. The parties' tax returns show that Edwin had business profits from the band of $1,878 in 2008; $1,670 in 2009; and $5,134 in 2010. The band manager testified that Edwin's gross income for his participation in the band in 2011 was $10,470, which was comparable to the other band members' gross income in previous years.

Edwin offered, and the district court received into evidence, an exhibit showing his monthly living expenses to be $4,430.86. Edwin testified that this was a fair representation of his monthly living expenses. He testified that there was nothing reflected in the exhibit that he could not afford based on cashflow and that the exhibit reflected the bills he was actually paying at the time of trial.

The parties purchased the marital residence in 2004. There is no evidence in the record as to the purchase price. The value of the marital residence was an issue at trial. Edwin did not have the house appraised, but he valued it at $190,000 based upon the amount of debt against the property. DeLana valued the house at $160,000. She testified that the county assessor valued the house at approximately $154,000 and that she had a Realtor tell her that with major home improvements, the most that the house could sell for would be $165,000.

While DeLana was living at her parents' home after the parties separated, Edwin changed the locks on the doors of the marital residence after he lost his key and DeLana failed to respond to his request for a copy of her key. During this period, DeLana occasionally entered the house while Edwin was at work. On one of the occasions she accessed the house after Edwin changed the locks, DeLana climbed through a broken window. DeLana admitted that on one occasion, she tore up three pictures that had Edwin in them. One of the pictures DeLana tore up was from the parties' wedding. She also tore up a picture that had one of Edwin's deceased relatives in it. DeLana intentionally broke a pair of Edwin's earphones and destroyed a purse that Edwin had given to her. DeLana inadvertently broke a watchbox and some Christmas ornaments. On a separate occasion, DeLana removed the cable boxes from the house. Edwin valued the earphones at $213.95, the watchbox at $100, and the Christmas ornaments at $100. He also claimed that DeLana took a Big 10 Husker football signed by Tom Osborne and Bo Pelini, which he valued at $500. Edwin discovered the football was missing when he moved to his new residence in mid-April 2012 and went through all the boxes and checked his office. Edwin testified that while

DeLana had never admitted to taking the football, because it was in the home, DeLana must have it. DeLana denied doing anything with the football and testified that she did not know what football Edwin was talking about.

There was evidence at trial about the parties' 2011 tax returns. DeLana provided her W-2 earnings to the parties' tax preparer prior to April 15, 2012, but she did not learn until June that the preparer had not filed a tax return. At that time, DeLana asked the preparer to file an individual return for her, but the preparer declined. DeLana then filed a separate individual return on her own for 2011. DeLana claimed both exemptions for the minor children and received a refund in the amount of $6,227. As of the first day of trial, July 17, 2012, Edwin still had not filed his 2011 tax return. He testified that he learned DeLana had filed separately only a few hours before trial.

The issue of Edwin's punctuality was discussed extensively at trial. Edwin testified that punctuality is a challenge that he continues to work on. Edwin's temporary parenting time included overnights every other Thursday. Edwin testified that he did not get Vicente to school on time on six separate occasions between March 16 when the temporary order was entered and the end of the school year. Reference to a 2012 calendar shows that three of the six tardies occurred on a Friday. A separate incident of Edwin's tardiness occurred on the Saturday following the first day of trial when Edwin was late getting Vicente to certain events at the Cornhusker State Games. As a result, Vicente was only allowed to compete in two of the four long jump rounds.

There was evidence at trial about the parties' communication difficulties. Edwin testified that he and DeLana were not communicating at the time of trial with the exception of text messages informing DeLana when he was running late. Edwin testified further that the parties experienced issues relating to following the terms of the temporary order with respect to parenting time. DeLana testified that the limited communications she had with Edwin since their separation were not very amicable and that he would attack her faith and tell her that she is ruining the children's lives by dragging them through the divorce process.

On November 19, 2012, DeLana filed a motion seeking to withdraw her rest and adduce additional evidence with respect to tardies that Vicente had during the 2012-13 school year while in Edwin's care. Edwin filed an objection. The district court denied DeLana's motion following a hearing.

The district court entered a decree on February 5, 2013, dissolving the parties' marriage. The court attached and incorporated its findings made in a letter to the parties dated January 24, 2013. A nunc pro tunc decree was entered on February 12 to correct a scrivener's error.

The district court awarded physical and legal custody of the children to DeLana, subject to Edwin's rights of parenting time set forth in the attached parenting plan. The court ordered Edwin to pay child support of $931 per month for two children and $644 per month when child support is owed for one child, commencing February 1, 2013. For purposes of child support, the court assigned total monthly income to DeLana of $4,467 and gave her credit of $131 for providing health insurance for the children. The court attributed to Edwin a gross annual income of $50,000, which results in a gross monthly income of $4,166.66.

The district court awarded Edwin parenting time every other week from Sunday at 2 p.m. to Thursday at 8 a.m. or the commencement of school, whichever is earlier. The court also set

forth a schedule of holiday and summer parenting time. The district court ordered that, unless otherwise agreed by the parties, Edwin was to provide transportation for his parenting time and that if he was 15 or more minutes late to pick up the children for a scheduled parenting time, he would forfeit that parenting time. The court included a similar forfeiture provision if Edwin failed to return the children within 15 minutes of the conclusion of his parenting time and if he failed to deliver the children to school in a timely fashion.

The district court awarded DeLana the tax dependency exemptions for both children for 2012. The court awarded Edwin the exemption for Vicente beginning in 2013, and when Vicente can no longer be claimed, the court awarded Edwin the exemption for MariElena in even-numbered years.

The district court identified, valued, and divided the marital estate. The district court ordered the parties to pay their own attorney fees and declined to award spousal support to either party.

Edwin filed a motion for new trial. On February 25, 2013, after the district court clarified certain rulings, which we discuss as necessary below, it denied the motion.

Edwin subsequently perfected his appeal to this court.

## III. ASSIGNMENTS OF ERROR

Edwin asserts that the district court erred in (1) awarding full custody to DeLana, (2) making certain orders with respect to parenting time, (3) setting child support, (4) allocating the 2012 tax dependency exemptions, (5) failing to allocate employment-related childcare expenses, (6) dividing the marital estate, (7) failing to grant Edwin alimony, and (8) failing to grant Edwin attorney fees.

## IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Rosloniec v. Rosloniec*, 18 Neb. App. 1, 773 N.W.2d 174 (2009).

An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005).

A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Fox v. Whitbeck*, 286 Neb. 134, 835 N.W.2d 638 (2013).

Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Molina v. Salgado-Bustamante*, 21 Neb. App. 75, 837 N.W.2d 553 (2013).

## V. ANALYSIS

### 1. CUSTODY

Edwin asserts that the district court erred in awarding full custody to DeLana. The district court awarded DeLana both physical and legal custody and specifically found that joint legal custody was not a viable option, since the court was not convinced the parties would be able to sit down and make mutual, fundamental decisions regarding the children's welfare. Although not absolutely clear, it appears from Edwin's appellate brief that he is challenging only the failure to award joint legal custody as opposed to joint legal and joint physical custody.

Joint legal custody has been generally defined as joint authority and responsibility for making major decisions regarding the child's welfare. *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999). Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time. *Elsome v. Elsome, supra*; *Hill v. Hill*, 20 Neb. App. 528, 827 N.W.2d 304 (2013). Neb. Rev. Stat. § 42-364(2) (Cum. Supp. 2012) provides that "[c]ustody shall be determined on the basis of the best interests of the child, as defined in the Parenting Act" and in subsection (3), which provides:

> Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

The Parenting Act, in Neb. Rev. Stat. § 43-2929(1) (Cum. Supp. 2012), requires that a parenting plan "serve the best interests of the child." Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2012) provides in part that the "best interests of the child require":

> (1) A parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children;
>
> . . . .
>
> (4) That even when parents have voluntarily negotiated or mutually mediated and agreed upon a parenting plan, the court shall determine whether it is in the best interests of the child for parents to maintain continued communications with each other and to make joint decisions in performing parenting functions as are necessary for the care and healthy development of the child.

In their pleadings, neither party requested joint custody. No agreement was reached by the parties with respect to either joint physical custody or joint legal custody. At trial, Edwin offered a proposed parenting plan in which he requested custody of the children "on a week-on, week-off basis." Edwin acknowledged that the parties have, at this point, significant personal difficulties and that their communication difficulties would make joint custody difficult, but he opined that the parties had never had any real disputes regarding the children's schooling,

medical care, or religion. Edwin testified that the parties had reached an agreement prior to their marriage that any children could be raised in Catholic school through middle school but would attend public high school. Edwin was fairly certain that education would be an issue between the parties in the future. Nevertheless, he felt joint custody would be in the children's best interests because the parties are both loving and involved parents.

DeLana's testimony reflects the parties' communication difficulties. She did not specifically testify about joint custody or Edwin's proposal.

Our de novo review leads us to conclude that the district court did not abuse its discretion in awarding DeLana both physical and legal custody of the children.

## 2. PARENTING TIME

Edwin asserts that the district court erred in making certain orders with respect to parenting time. Specifically, he asserts that the court erred in setting the regular parenting schedule; in ordering that if Vicente was tardy to school, Edwin would forfeit his parenting time; and in ordering a summer parenting time schedule that neither party requested. We address each of these assertions in turn.

### (a) Regular Parenting Time

The temporary order provided Edwin with parenting time every other week from 7 a.m. Thursday to 5 p.m. Friday and on alternate weeks from 6 p.m. Sunday to 8 a.m. Wednesday. This provided Edwin with a total of four overnights of parenting time every 14 days. In the decree, the district court awarded Edwin parenting time every other week from Sunday at 2 p.m. to Thursday at 8 a.m. or the commencement of school, whichever is earlier. This schedule retained four overnights every 14 days for Edwin, but it made them consecutive rather than three overnights one week and one overnight the next week. Edwin asserts that the court erred in eliminating his Thursday overnight parenting time. He notes that DeLana's regular schedule includes work overnight Thursday from 7 p.m. to 7 a.m. and argues that this will require the children to be in the care of someone other than a parent on Thursday nights.

It is clear from reviewing the district court's letter that was incorporated into the decree, that Edwin's issues with punctuality were a key factor in the elimination of the Thursday overnight parenting time. The record shows that half of Vicente's tardies while in Edwin's care under the temporary order occurred on Fridays. We agree that getting Vicente to school on time is important. We find no abuse of discretion in the district court's award of regular parenting time.

### (b) School Tardiness

Edwin asserts that the district court erred in including a provision in the parenting plan that Edwin's failure "to insure that the children are delivered to school in a timely fashion (i.e., not being tardy) will also constitute a waiver of his next scheduled parenting time." The court made specific findings in its January 2013 letter about the tardiness issue. The court observed that DeLana's motion to withdraw her rest was based upon Vicente's six tardies between August 23 and October 26, 2012. The court presumed that "[s]ince [DeLana's] affidavit dated December 18 [in support of her motion did] not mention any tardies subsequent to October 26 . . . none

[had] been reported to her." The court noted Edwin's trial testimony acknowledging that punctuality is an issue for him. The court expressed its concern that Edwin apparently continued to have trouble getting Vicente to school on time but proceeded on the presumption that the problem had been rectified. The court also observed that the tardies occurred when Edwin had the children overnight on Thursday and that the Thursday overnight had been eliminated in the parenting plan set forth in the decree.

Edwin asserts that because the court denied DeLana's motion to withdraw her rest, it was error for the court to rely upon evidence of the tardies between August and October 2012. He also argues that the court should have at least made such a punctuality requirement reciprocal.

The record does not show that the district court relied on DeLana's evidence of additional tardies in including a forfeiture provision in the parenting plan. While the court did reference DeLana's exhibit in its January 2013 letter, it ultimately proceeded on the presumption that the problem had been rectified. There was sufficient evidence presented at trial regarding Vicente's tardiness while in Edwin's care during the temporary period and Edwin's issues with punctuality for the court to include this provision in the parenting plan. We find no abuse of discretion.

(c) Summer Parenting Time

Edwin asserts that the district court erred in setting a summer parenting time schedule that neither party requested. Edwin requested a weekly rotation of parenting time during the summer. DeLana proposed that Edwin have 3 weeks of summer parenting time to be exercised a week at a time. The court awarded summer parenting time modeled after the standard summer parenting time schedule under local court rules. See Rules of Dist. Ct. of Third Jud. Dist. 3-9(F)(a) (rev. 2013). Rule 3-9(F)(a) provides that "Appendix Form 3 is a standard parenting time schedule which, in the absence of unusual circumstances, the court finds provides reasonable parenting time for the noncustodial parent in cases in which the parties are unable to agree otherwise." Rules of Dist. Ct. of Third Jud. Dist., appendix form 3 (rev. 2010), provides for the following summer parenting schedule, which is the schedule followed by the district court in this case:

> Summer is that period beginning at 9:00 a.m. on the 7th day following the last day of school before the summer break and ending at 5:00 p.m. on the 7th day preceding the first day of school in the fall. During the summer, the 10/4 parenting schedule shall be suspended and the noncustodial parent shall have the following periods of parenting time: (a) from 9:00 a.m. on the 21st day following the last day of school for 2 weeks and (b) from 9:00 a.m. on the 21st day prior to the first day of school in the fall for 2 weeks. Each 2-week period shall be uninterrupted. The noncustodial parent shall keep the custodial parent advised where the summer visitation will take place and provide the custodial parent reasonable telephone contact.

Here, where the parties did not agree on the summer parenting time schedule and were on notice that the parenting time schedule contained in the local rules could be applied when parties could not agree, we find no abuse of discretion in the court's award of summer parenting time modeled after the local court rules.

3. CHILD SUPPORT

Edwin asserts that the district court erred in setting child support. Specifically, he asserts that the court erred in determining his income based on his monthly expenses, finding he was current on monthly expenses, and failing to abate his child support obligation during his summer parenting time. We address each of these assertions in turn.

(a) Edwin's Income

Edwin asserts that the district court erred in determining his income for child support purposes based upon his monthly expenses.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). The Nebraska Child Support Guidelines provide that in calculating the amount of child support to be paid, the court must consider the total monthly income, which is defined as the "income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages" and includes income that "could be acquired by the parties through reasonable efforts." Neb. Ct. R. § 4-204. Section 4-204 also provides, "If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." In the initial determination of child support, earning capacity may be used where evidence is presented that the parent is capable of realizing such capacity through reasonable effort. *Collins v. Collins*, 19 Neb. App. 529, 808 N.W.2d 905 (2012).

In setting Edwin's income for child support purposes, the court detailed Edwin's education; his work history and income from 2000 to 2007; his work history, commissions, and business losses from 2007 through the time of trial; his earnings from the band; deposits of over $34,500 into Edwin's accounts in the first half of 2012; and his monthly living expenses. The court then attributed to Edwin gross annual income of $50,000, which resulted in a gross monthly income of $4,166.66.

Edwin maintains that the court simply annualized his monthly expenses to arrive at an income figure. The court did state in its findings, "On the other side of the ledger . . . is [Edwin's] monthly living expenses, which total $4,430.86. According to [Edwin], he is able to pay and, in fact, does regularly pay those expenses. Those expenses annualize to $53,170.32 (strikingly similar to the annual income attributed to [Edwin] by [DeLana])." Our review of the entirety of the district court's findings leads us to conclude that, although the court considered Edwin's ability to meet his monthly expenses in determining his earning capacity, this was not the sole reason for the court's determination. It is apparent from our de novo review of the record and the court's analysis of this issue that the court carefully considered all of the evidence presented at trial as to Edwin's work and earnings history, education, and occupational skills, and determined that he had an annual earning capacity of $50,000.

Edwin further expresses concern that the court did not adequately consider his business expenses in setting his child support obligation. This is simply another way of arguing that the district court should have used the actual income shown in Edwin's tax returns as opposed to the

alternative use of earning capacity. The Nebraska Supreme Court has previously noted that the actual earning capacity of a spouse is frequently more important than the profitability of that spouse's business in determining the propriety of an award for child support. See, *Rauch v. Rauch*, 256 Neb. 257, 590 N.W.2d 170 (1999); *Knippelmier v. Knippelmier*, 238 Neb. 428, 470 N.W.2d 798 (1991).

Upon our de novo review of the evidence, and taking into account the particular circumstances of this case, we cannot say that the district court abused its discretion in utilizing earning capacity in lieu of actual income and in finding that Edwin is capable of realizing a $50,000 per year earning capacity. The district court did not abuse its discretion by imputing that amount to Edwin in the child support calculation. This assignment of error is without merit.

## (b) Edwin's Expenses

Edwin asserts that the district court erred in finding that he was current on his monthly expenses. We address this argument to the extent of our finding above that the district court considered Edwin's ability to meet his monthly expenses as a factor in determining his earning capacity, but not as its sole reason.

A list of Edwin's monthly expenses totaling $4,430.86 was admitted into evidence as exhibit 8. Edwin testified that the information on exhibit 8 was a fair representation of his monthly expenses, that there was nothing listed that he could not afford based on his cashflow, and that exhibit 8 was reflective of the bills he was actually paying at the time of trial. Edwin testified several times that he was able to meet his monthly expenses because his expenses and cashflow fluctuate. Edwin testified that he was solely responsible for paying his expenses, though if needed, his mother would give him a loan. He testified that since the beginning of 2012, no one had helped him pay the expenses listed on exhibit 8. When questioned further about how he was able to pay his expenses, Edwin replied that "[t]here's credit card debt." We note that Edwin was assigned a total of approximately $16,000 on three credit cards that were in his name only. The record shows that two of the credit cards were opened by Edwin in 2007 and were used for both his business and personal/family expenses and that the current balances on all of the cards were for expenses incurred during the marriage.

In its order ruling on Edwin's motion for new trial, the district court noted Edwin's allusion to credit card debt when asked about his ability to pay his monthly expenses; however, the court found that Edwin did not specifically testify that he was having to pay his monthly expenses by credit card and that he offered no documentation that he was doing so. The court observed that Edwin was very evasive about how he was able to pay approximately $4,400 worth of monthly expenses while only earning, as claimed by Edwin, $427 per month. The court expressed its belief that if Edwin had been paying his expenses by credit card, he would have presented some documentation in support of his claim.

Clearly, Edwin's testimony on this issue was conflicting, and the court chose to credit Edwin's testimony that he was able to pay and was paying his monthly expenses. We defer to the lower court in that regard and find no abuse of discretion. Our review of the record leads us to the same conclusion; namely, that Edwin was not presently meeting his monthly expenses only with the aid of credit cards. This assigned error is without merit.

## (c) Summer Abatement

Edwin asserts that the district court erred in failing to abate his child support obligation during his summer parenting time. The Nebraska Child Support Guidelines provide:

> If child support is not calculated under § 4-212 [joint physical custody], an adjustment in child support may be made at the discretion of the court when visitation or parenting time substantially exceeds alternating weekends and holidays and 28 days or more in any 90-day period. During visitation or parenting time periods of 28 days or more in any 90-day period, support payments may be reduced by up to 80 percent. The amount of any reduction for extended parenting time shall be specified in the court's order and shall be presumed to apply to the months designated in the order.

Neb. Ct. R. § 4-210.

Edwin was awarded two 2-week periods of summer parenting time. Thus, his parenting time amounts to 28 days in a 90-day period and would have met the criteria for consideration of up to an 80-percent reduction. However, under the guidelines, any such child support adjustment is left to the discretion of the trial court. We find no abuse of discretion under the circumstances of this case.

## 4. TAX DEPENDENCY EXEMPTIONS

Edwin asserts that the district court erred in allocating the 2012 tax dependency exemptions. The court awarded DeLana the right to claim both of the minor children as dependents in 2012 and divided the exemptions equally between the parties thereafter.

The dependency exemption for income tax returns is an economic benefit. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). A tax dependency exemption is nearly identical in nature to an award of child support or alimony. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). The general rule is that a custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Id.* But, a court may exercise its equitable powers to allocate the exemption to a noncustodial parent. *Id.*

The parties separated on January 29, 2012, when DeLana and the children left the marital residence and went to live with her parents. The district court entered an order on March 16, awarding temporary custody to DeLana and ordering Edwin to pay child support of $170 per month, which order extended until February 1, 2013, when the decree altered the child support. During 2012, DeLana was the primary custodial parent, and she received a minimal amount of temporary child support from Edwin. The court did not abuse its discretion in awarding both exemptions for 2012 to DeLana as the custodial parent.

## 5. EMPLOYMENT-RELATED CHILDCARE

Edwin asserts that the district court erred in failing to allocate employment-related childcare expenses. The Nebraska Child Support Guidelines provide that employment-related childcare expenses "due to employment of either parent or to allow the parent to obtain training or education necessary to obtain a job or enhance earning potential, shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution . . . ." Neb. Ct. R. § 4-214. The decree is silent on the issue of childcare

expenses, and the issue of childcare expenses was apparently not raised in connection with Edwin's motion for new trial, because it was not specifically addressed in the order on the motion for new trial. Presumably, the district court determined that it was not necessary to allocate the expenses between the parties.

At trial, DeLana testified that she does not have childcare expenses for the children while she is working, because her parents watch the children when necessary. Edwin's monthly living expenses exhibit alleges that he pays $738.38 per month for childcare during the summer months and $498.75 per month during the school year. He did not elaborate on these expenses in his testimony, nor did he provide childcare invoices or statements verifying these costs. Further, Edwin testified that he was attempting to reduce those expenses by working from home during his parenting time, but that he did not establish his expected childcare costs in light of this testimony.

The guidelines provide a court with some discretion as to the amount it orders an obligor to contribute toward childcare expenses. *Freeman v. Groskopf*, 286 Neb. 713, ___ N.W.2d ___ (2013). Based upon the record in this case and the parenting time that was ordered by the court, we conclude that the district court did not abuse its discretion by failing to allocate childcare expenses between the parties.

6. DIVISION OF MARITAL ESTATE

Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008). The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Sitz v. Sitz, supra.* Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006).

The district court awarded DeLana marital property (including the marital home, her retirement account, MariElena's bicycle, and a "Wii" game system (Wii)) totaling $184,457 and marital debt (including two mortgages on the marital home) totaling $196,752 for a net award of a negative $12,295. The court awarded Edwin marital property totaling $20,438 (including his insurance agency) and marital debt totaling $25,350 for a net award of a negative $4,912. The court declined to order any equalization payment. In doing so, the court considered that DeLana destroyed Edwin's property having a value of $413.95, that the evidence "does not support including any value for a football," and that DeLana received a tax refund of $6,227 by filing separately for 2011 and did not provide Edwin with any of the refund. The court made a reference to trial testimony that Edwin might also receive a refund for his 2011 filing but found no evidence as to what that refund amount might be.

Edwin asserts that the district court erred in its division of the marital estate. Specifically, he asserts that the court erred in its factual finding on Edwin's 2011 tax return, determining the value of the marital residence, allowing DeLana to keep her full retirement account, allocating

the children's property, and valuing the autographed football. We address each of these assertions in turn.

### (a) 2011 Tax Return

Edwin asserts that the district court erred in its factual finding that he expected a refund from his 2011 individual tax return. He argues that the court should have awarded him one-half of the 2011 refund received by DeLana and ordered the parties to divide whatever refund or tax obligation was due from his 2011 individual return.

At trial, Edwin was asked whether he anticipated a refund upon filing his 2011 return. The district court sustained the hearsay objection to this question. In its January 2013 findings that were incorporated into the decree, the court stated, "Although there was mention that [Edwin] might also receive a refund for the 2011 filing, there is no evidence on what that was projected to be." In its order ruling on Edwin's motion for new trial, the court stated:

> While it may very well be that the use of the word "refund" when referring to [Edwin's] 2011 filing was incorrect (I have not gone through the trial to find reference to his projected 2011 filing), it remains that no evidence was presented on what any amount owing or refund due would be during the two days of trial.

To the extent that the district court erred in its earlier finding, it corrected that finding in the order ruling on Edwin's motion for new trial. Our review of the record shows no evidence as to the amount of any expected refund or tax liability due to Edwin's 2011 return.

Further, DeLana's receipt and retention of her full 2011 tax refund of $6,227 was factored into the division of marital property as shown above when the district court did not equalize the division of the marital estate such that Edwin's net award, albeit negative, was approximately $7,300 greater than that of DeLana.

We find no abuse of discretion in the district court's failure to divide DeLana's 2011 separate income tax refund or in the implicit finding that Edwin will be entitled to receive any refund, or be obligated for any liability, in connection with his separate 2011 tax return.

### (b) Valuation of Marital Residence

Edwin asserts that the district court erred in valuing the marital residence. The court awarded the residence to DeLana at a value of $160,000. The court assigned DeLana debt against the residence totaling $188,656 (first mortgage of $128,600, second mortgage of $31,241, and line of credit of $28,815). Edwin valued the residence at $190,000 based solely upon the amount of debt against the property. DeLana valued it at $160,000. She testified that the county assessor valued the property at $154,000 and that a Realtor had advised her that the most the house could be sold for was $165,000. The evidence on this issue was conflicting, and the court clearly accepted DeLana's valuation over Edwin's. We defer to the lower court in that regard and find no abuse of discretion.

### (c) DeLana's Retirement Account

Edwin asserts that the district court erred in allowing DeLana to keep her full retirement account. The court awarded DeLana both her retirement account valued at $15,878 and her "403(b)" account valued at $1,079. At trial, Edwin asked the court to divide DeLana's retirement

account equally. In dissolution proceedings, the trial court has broad discretion in valuing and dividing the parties' retirement accounts. *Ging v. Ging*, 18 Neb. App. 145, 775 N.W.2d 479 (2009). Edwin's only argument in support of this assignment of error is that he does not have any retirement account. DeLana's retirement account was included in the court's division of the marital estate, and as discussed below, the estate has been divided equitably. It was within the court's discretion to include DeLana's retirement account on her side of the ledger rather than dividing it equally between the parties. Edwin's assignment of error is without merit.

### (d) Children's Property

Edwin asserts that the district court erred in ordering him to transfer MariElena's bicycle and the Wii to DeLana. First, Edwin argues that the overall personal property division was inequitable. Second, he argues that MariElena already had a bicycle available at DeLana's residence. Finally, he argues that DeLana does not have a television with which to use the Wii. Edwin's arguments are incorrect.

At trial, Edwin testified he believed that the items DeLana received when the parties divided their household possessions had a greater value but that if the parties maintained the items currently in their possession, the division of household property was fair and reasonable. DeLana testified to her understanding that when Edwin left the marital residence, he was only going to take "everything that was downstairs." According to DeLana, Edwin took additional items, including the children's bicycles that were downstairs but would normally have been stored in the garage and the Wii which was upstairs. DeLana requested the return of certain items, including the Wii and MariElena's bicycle, and that if those items were returned, she thought there would be an equitable division of the household goods. Contrary to Edwin's assertions, DeLana did not testify that MariElena's bicycle had already been replaced. She testified, when asked if her daughter rides "a bicycle," that she was "given that bike for her birthday." Likewise, she did not testify that she does not have a television. DeLana testified that she does not have cable because she cannot afford it. When DeLana was asked about a "40-inch LCD TV" she received when the parties divided their household goods, she testified that she did not have that particular television anymore. She testified that she wanted the Wii back because the children want to play with it.

The district court clearly credited DeLana's testimony about these items over Edwin's. There is no evidence in the record about the value of these particular items or about the total value of the household goods divided. The court did not abuse its discretion in ordering Edwin to return the Wii and MariElena's bicycle to DeLana.

### (e) Valuation of Football

Edwin asserts that the district court erred in its determination of the value of the autographed football. The essence of his argument is that the court erred in failing to value the football at $500 based on Edwin's testimony and in failing to charge DeLana for its loss. The court found in the decree that the evidence did not support including any value for a football in the property division. The court clarified this in ruling on Edwin's motion for new trial, stating that although there was evidence about the value for a football, there was not sufficient evidence to conclude that DeLana took the football. We agree with the court's conclusion. The evidence

supports a conclusion that Edwin is unable to locate an autographed football, which he valued at $500; the evidence does not support a conclusion that DeLana took the football. Accordingly, the court did not abuse its discretion in failing to include the football in the property division.

### (f) Conclusion

The district court awarded DeLana marital property totaling $184,457 and marital debt totaling $196,752 for a net award of a negative $12,295. The court awarded Edwin marital property totaling $20,438 and marital debt totaling $25,350 for a net award of a negative $4,912. The discrepancy in the awards in Edwin's favor is explained by the district court in connection with DeLana's destruction of Edwin's personal property and DeLana's retention of her 2011 income tax refund. We conclude that the district court did not abuse its discretion in its determination, valuation, and division of the marital estate. Edwin's assigned errors are without merit.

## 7. ALIMONY

Edwin asserts that the district court erred in failing to grant him alimony. At trial, he asked the court to award him alimony of $1,000 a month for 4 years. He testified that this would essentially allow him to pay the child support being requested by DeLana. In denying Edwin's request, the court found that Edwin's request misunderstands the purpose of spousal support. We agree.

Section 42-365 provides in relevant part:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

In addition to the criteria listed in § 42-365, in considering alimony upon a dissolution of marriage, a trial court is to consider the income and earning capacity of each party, as well as the general equities of each situation. *Becker v. Becker*, 20 Neb. App. 922, 834 N.W.2d 620 (2013). The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support, and the duration of an alimony award must be reasonable in light of this purpose. *Zoubenko v. Zoubenko*, 19 Neb. App. 582, 813 N.W.2d 506 (2012). Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Smith v. Smith*, 20 Neb. App. 192, 823 N.W.2d 198 (2012). However, disparity in income or potential income may partially justify an award of alimony. *Becker v. Becker, supra.* In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id.*

The parties were married for 8 years. At the time of trial, Edwin was 35 years old and DeLana was 33. Their children, Vicente and MariElena, were 6 years old and almost 4,

respectively. Both parties contributed to the marriage through their employment and by caring for their children. Neither party interrupted a career or education to care for the children. Also, both parties have been able to engage in gainful employment without interfering with the interests of the children. The district court found that Edwin has an annual earning capacity of $50,000 and assigned a gross monthly income to Edwin of $4,166.66 for purposes of setting child support, which we have affirmed above. DeLana's gross monthly income is $4,467. Thus, there is not much discrepancy in their ability to earn income. We find no abuse of discretion in the court's declination to award alimony to either party.

## 8. ATTORNEY FEES

Edwin asserts that the district court erred in failing to grant him attorney fees.

An award of attorney fees involves consideration of such factors as the nature of the case, the services performed and results obtained, the length of time required for preparation and presentation of the case, the customary charges of the bar, and general equities of the case. *Vlach v. Vlach*, 286 Neb. 141, 835 N.W.2d 72 (2013).

Edwin presented an attorney fee affidavit at trial, showing that up to trial, he had incurred legal fees from his current attorney of $10,083.75 and costs of $504.20. He also testified that he had paid approximately $1,000 to his former attorney. Edwin argues that he is entitled to attorney fees because he was forced to incur substantially more fees than would have been otherwise necessary. Edwin contends DeLana should be responsible for a portion of his attorney fees, because she declined his initial proposal to settle the divorce without attorneys for $600. He also cites DeLana's intentional destruction of some of his property and alleges she filed many unsuccessful pretrial motions and extended the length of trial.

Upon our de novo review, we find no merit to Edwin's arguments. The district court did not abuse its discretion in failing to award attorney fees to either party.

## VI. CONCLUSION

The district court did not abuse its discretion in awarding custody, setting parenting time, determining child support, dividing the tax dependency exemptions, dividing the marital estate, choosing not to allocate childcare expenses between the parties, and declining to award Edwin alimony and attorney fees.

AFFIRMED.