IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

GOODWIN V. GOODWIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

VIOLET L. GOODWIN, APPELLANT,

V.

DAVID E. GOODWIN, JR., APPELLEE.

Filed February 18, 2020.    No. A-19-075.

Appeal from the District Court for Douglas County: J. MICHAEL COFFEY, Judge. Affirmed as modified.

Violet L. Goodwin, pro se.

David E. Goodwin, Jr., pro se.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Violet L. Goodwin, pro se, appeals from the decree entered by the Douglas County District Court dissolving her marriage to David E. Goodwin, Jr. Violet contends the district court erred by denying a protection order, denying a motion to recuse, failing to continue a hearing, and failing to order hair follicle testing of David. She also challenges the award of joint physical custody, and the district court's determinations as to child support and alimony, the sale of the marital home and equal allocation of responsibility for payment of delinquent real estate taxes, and the decree's language regarding the parties' life insurance policies. We affirm as modified.

## II. BACKGROUND

Violet and David married in 1999. They have three children together, sons born in 1998, 2006, and 2008. The oldest child reached the age of majority by the time the divorce decree was

entered and is not affected by these proceedings. Our record indicates that Violet initially filed for divorce in 2013, but that case closed sometime thereafter without the parties' marriage being dissolved.

### 1. PRETRIAL PROCEEDINGS AND INTERLOCUTORY APPEALS

On April 6, 2017, Violet, pro se, filed a "divorce petition" seeking a dissolution of her marriage to David, temporary child support and custody, possession of the marital home located in Omaha, Nebraska, and an equitable division of the parties' business. She also requested an "ex parte order" "estopping [David] from running out of town, taking off with her children, and [David] ordered not to do any side deals on the estate, [marital] residence."

On April 25, 2017, David filed an answer and "counter complaint." In his answer, he generally denied the material allegations of Violet's petition. In his "counter complaint," he asked for dissolution of the parties' marriage, temporary and permanent joint legal and physical custody of the parties' minor children or alternatively that he be awarded sole legal and physical custody. He also requested that child support be calculated pursuant to the Nebraska Child Support Guidelines, and for an equitable division of the marital estate. He stated he had moved out of the marital home on or about March 28.

On May 1, 2017, Violet filed a "Reply to [David's] Motion for 'Allowances,'" and asked the district court "to hold [David] liable for filing frivolous dilatory motion [sic] in seeking allowances for child support etc." Violet disputed David's requests set out in his "counter complaint" for joint custody and a calculation of child support. In her reply, and generally in several other filings, Violet alleged she was financially dependent on David but that he had "run off" with "all the money" while she was a "full time caregiver." She contended that David had a criminal record and was using illegal drugs.

According to an "Order for Temporary Allowances" (Temporary Order) filed on May 8, 2017, a hearing was held that day, but Violet did not appear. In its order, the district court overruled various motions filed by Violet and sustained David's "Motion for Temporary Allowances." The parties were granted temporary joint legal and physical custody of their minor children, with parenting time to occur on alternating weeks. The court imputed an equal amount of income to each party ($2,207) and stated that no child support was ordered. The court also stated that no temporary alimony was awarded. Violet was granted possession of the marital home and was to be responsible for all associated expenses and maintenance. Violet and David were "prohibited from being present at the residence of the other" and were to conduct all communication via "text or email."

On May 23, 2017, the district court entered an ex parte order at David's request, ordering law enforcement to assist David during the pendency of the action to retrieve the minor children from any third parties during his parenting time.

Violet filed numerous interlocutory appeals during the pendency of the divorce action in 2017, all of which were dismissed by this court for lack of jurisdiction.

On June 7, 2018, Violet filed an amended motion to recuse the district court judge (original motion filed on December 22, 2017). Following a hearing, the request for recusal was denied.

## 2. TRIAL

Trial took place on November 20, 2018. Violet was represented by counsel during trial. Violet and three other individuals testified on her behalf. David testified in his own behalf. Each party offered exhibits which were received into evidence. The relevant evidence will be set forth as needed in our analysis below.

## 3. DECREE OF DISSOLUTION AND VIOLET'S FURTHER APPEALS

On January 16, 2019, the district court entered a decree dissolving the parties' marriage. As pertinent here, the court awarded Violet sole legal custody of the parties' two minor children, but awarded the parties joint physical custody with alternating weeks of parenting time. The remainder of Violet's proposed parenting plan was found to be in the best interests of the children and was attached to and incorporated by reference into the decree. David was ordered to pay $274 per month in child support to Violet for the two minor children, beginning on February 1.

Each party was awarded "any life insurance policies in their own name." David was ordered to pay alimony to Violet in the amount of $350 per month for 48 months, beginning on February 1, 2019. The marital home was ordered to be "listed for sale on or before January 1st, 2020"; the district court ruled that the "net equity after payment of commissions and any delinquent taxes shall be divided by the parties equally." Further the court ordered: "From the date of the entry of the decree until the sale of of [sic] said real estate [Violet] shall be responsible for the maintenance of the residence together with the utilities." The district court denied any further request for relief made by either party which was not specifically granted in the decree.

Violet, pro se, appeals from the divorce decree. Subsequent to filing her notice of appeal for the present action, Violet filed two additional separately docketed appeals, which have since been dismissed by this court for failure to file briefs or for lack of jurisdiction (see cases Nos. A-19-526 and A-19-548).

## III. ASSIGNMENTS OF ERROR

Violet's replacement brief fails to set forth a separate section assigning errors as required by our appellate court rules. Instead, following her "STATEMENT OF FACTS," Violet's brief contains a heading titled "ASSIGNMENT OF ERROR/ARGUMENT"; this section consists of nine numbered paragraphs in which Violet argues various aspects of the district court's proceedings and determinations, but she does not specifically list or otherwise identify assigned errors. Furthermore, Neb. Ct. R. App. P. § 2-109(D)(1)(d), (e), and (f) (rev. 2014) require a separate section for assignments of error, designated as such by a heading, and also requires that the section be located after a statement of the case and before a list of controlling propositions of law. Assignments of error consisting of headings or subparts of the argument section do not comply with the mandate of § 2-109(D)(1)(e). *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). In such a situation, an appellate court may proceed as though the appellant failed to file a brief or, alternatively, may examine the proceedings for plain error. See *id*. The decision to proceed on plain error is at the discretion of the appellate court. *Id*. We elect to review the record for plain error.

David, pro se, filed a brief that did not comply with appellate briefing rules and was ordered to submit a replacement appellee brief on or before a specific date. He filed his replacement brief

1 day late, and to the extent he raised any alleged errors of the district court within it, he did not follow several of the briefing rules for cross-appeals under § 2-109(D)(4), including a designation of a cross-appeal on the cover of his brief and a separate cross-appeal section in his brief. Therefore, we do not consider the merits of any alleged errors raised in his brief.

Parties who wish to secure appellate review of their claims must abide by the rules of the Nebraska Supreme Court. *Steffy v. Steffy, supra.* Any party who fails to properly identify and present its claim does so at its own peril. *Id.*

## IV. STANDARD OF REVIEW

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Steffy v. Steffy, supra.*

Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

Violet's replacement brief contains arguments regarding the district court's denial of a protection order, denial of a motion for recusal, failure to continue a hearing, and failure to require hair follicle testing of David. She also challenges the district court's decision regarding joint physical custody, child support and alimony, the sale of the marital home and the equal allocation of responsibility for delinquent real estate taxes, and the decree's language regarding life insurance policies. We address each issue in turn under a plain error analysis.

### 1. PROTECTION ORDER

In pretrial filings, Violet alleged that a protection order against David was granted by a different trial judge upon her request at the end of May 2017, but was then "dismissed" in the present action. Violet complains the dismissal "[was] outrageous, arbitrary, and capricious." Brief for appellant at 17.

A protection order hearing took place in district court case No. "CI-17-4455," which is not the case number at which the instant dissolution of marriage case was docketed in the district court (case No. CI-17-2781). Our record does not show dismissal of any protection order that was issued in the case before us. Further, in this case, just days after Violet filed for divorce, the district court entered a mutual restraining order upon both parties and included orders for limited contact between the parties under the Temporary Order and final decree. Violet's argument regarding an alleged "dismissed" protection order in another case is irrelevant here.

### 2. MOTION TO RECUSE

Violet's alleged grounds for recusal, as stated in her filings, were that the district court judge: (1) "has his own marital problems" and "custody issues" that "cause him to deny all of [her] motions" and "ignore evidence" about David; (2) denied Violet the "right to put her witness on the stand at the Protection Order hearing" and "dismissed" the protection order; (3) denied her temporary child support, full custody, and alimony "as was granted to her" by a different judge (apparently in December 2013 in a previous divorce action that was eventually dismissed); (4)

"mocked" her "as a pro-se litigant seeking relief"; and (5) is biased against Violet's father (emphasis omitted). Affidavits generally repeating the allegations within her motion and amended motion to recuse were not offered into evidence at the hearing on recusal.

The record does not show that any of the judge's personal matters impacted his rulings in this divorce action. Several of Violet's pretrial filings and appeals indicate her displeasure with the Temporary Order. But Violet admittedly did not appear at the "first court hearing" (prior to the Temporary Order) and, thus, could not have presented argument or evidence for the district court's consideration. There was no evidence offered by Violet for the court to "ignore." See *In re Estate of Radford*, 297 Neb. 748, 901 N.W.2d 261 (2017) (pleadings alone are not proof but mere allegations of what parties expect evidence to show; pleadings and their attachments which were not properly admitted into evidence could not be considered by trial court). For a similar reason, any ruling by a different trial judge in her prior 2013 dismissed divorce action was unproved and irrelevant to the 2017 rulings under the Temporary Order. Further, allegations regarding a bias against her due to the identity of her father were unsubstantiated. We have already discussed the irrelevancy of the protection order to this case.

Violet has acted pro se throughout this case (except for trial). She is upset with the following exchange from a hearing:

> [Violet]: . . . I would like for you to consider me as a pro se litigant and construe liberally what it is that I'm trying to do to protect and gain custody of my children.
>
> THE COURT: I would suggest you need to get a lawyer.

After Violet explained she could not do that, the district court suggested she "go to Legal Aid" and correctly informed Violet that if she planned to represent herself she "still ha[d] to follow the rules." See *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigant will receive same consideration as if he or she had been represented by attorney, and, concurrently, that litigant is held to same standards as one who is represented by counsel). Although Violet feels otherwise, the record does not show that the court "scolded" her for not being able to hire an attorney. Brief for appellant at 20. Any other reasons Violet now argues warranted recusal were not in her motions for recusal and will not be addressed. See *Friedman v. Friedman, supra* (pro se litigants, like any other, may not present issues, arguments, and theories for first time on appeal). Violet did not establish bias or prejudice as a matter of law. We find no plain error in the denial of her recusal request.

### 3. FAILURE TO CONTINUE HEARING

Violet states that she arrived for a "court date" on "May 6" at 3 p.m. but the hearing had been at 10 a.m. Brief for appellant at 22. (The record indicates she is referring to a hearing which took place on May 8, 2017, which she did not attend). She argues that the district court "seeing [she] filed the pleadings" and "did not appear" could have "continued the hearing" or "sent the sheriffs to see if she was ok." *Id.* She does not assert, nor does the record show, that she actually filed a motion to continue the hearing or otherwise requested one ahead of the hearing for which she did not appear. She does not even allege a reason for why she did not appear. We find no plain error in the district court not continuing a hearing for which no such request was made.

## 4. FAILURE TO REQUIRE HAIR FOLLICLE TESTING

Violet claims the district court "refused to order [David] to get hair follicle testing!" Brief for appellant at 19. However, Violet fails to direct us to any part of the record to support her assertion. There is a motion for hair follicle testing dated September 21, 2018, which was prepared by the attorney who represented Violet for trial and which was included in an exhibit received into trial evidence. However, it is not file-stamped nor otherwise contained in the transcripts filed with this court on appeal. Nor does Violet direct us to any order denying such a request. Regardless, we note that Violet was able to testify at length about David's alleged past and continuing illegal drug use, and this was therefore a matter contemplated by the district court when weighed against David's testimony denying any use of illegal drugs for the past 3 years. Such factual determinations are for the trial court and will not be reconsidered here. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019) (trial court weighs credibility of witnesses and evidence and determines what evidence should be given greater weight when arriving at factual determination on merits).

## 5. PHYSICAL CUSTODY

Violet argues the joint physical custody award was "without any regards [sic] for the facts or the law." Brief for appellant at 18. When deciding custody issues, the court's paramount concern is the children's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016), and *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004), set forth factors relevant to the children's best interests for a court to consider when determining custody.

### (a) Evidence From Trial

At the time of trial, the parties resided in separate residences in Omaha, Nebraska. David had worked as a barber for several years. According to Violet, she worked as a licensed cosmetologist for over 20 years and earned associate and bachelor degrees of science in criminal justice, as well as a master of science degree in public administration. Sometime in 2010, she stopped working to care for the parties' children. Violet testified the parties opened their own barber shop in 2012, but David testified that (at the time of trial) he rented a booth inside a barber shop and did not own the shop. Violet stated that by the time of trial, she had applied for jobs and had been doing her own "nonprofit" work that involved renting out rooms in the marital residence.

One of Violet's renters testified during trial and admitted he was a convicted felon (burglary) and had been imprisoned in the past. Violet admitted she knew he was a convicted felon before he moved into the marital home around January 2018, but said she had already known him for 9 years, was satisfied he would not be a danger to the children, and had rules for him to follow. David believed other people (renters) living in the marital home limited the growth of the children.

Violet testified she was the primary caregiver of the children prior to filing for divorce and described David's involvement with the children as minimal, stating he was not home approximately three to four nights per week. But Violet recalled that David ate meals with the children when he lived at the marital home. She recounted how David watched football games with the children and enrolled them in football at some point, transporting them to practices. According to David, when he lived at the marital home, he helped with everything the children needed such as feeding them, directing their nighttime schedule, and handling football matters.

Violet stated she was concerned about the parties' middle child playing football because of a meningitis infection that led to spinal surgery when he was 4 or 5 years old. She asserted that she was the one that took that child to medical and dental appointments yet admitted David was "briefly" present for the spinal surgery (David said he was there "[e]very day"). The parties agreed they visited a doctor before signing up that child to play football; David said they received clearance for the child to play.

Violet said David went to jail for his "drug addiction and the robberies" in 2012, and that he had another drug-related conviction prior to that. She believed David still used illegal drugs because he would go "missing" for days and on return looked "disheveled" and "started talking about leaving town" and "selling the house." She said that in November and December 2016 and January 2017, he admitted to using illegal drugs. Regarding the time from January 2016 to the time the parties separated, Violet claimed she "would see" David smoking marijuana in his truck. She said David also admitted to using cocaine around that timeframe and that she had seen him do that. In 2016, Violet discovered David had an apartment in Phoenix, Arizona, where he was "doing some type of setup for a drug business" to sell medical marijuana. Violet agreed that David would talk about how he wanted to sell cocaine too. Violet believed David sold drugs before, and said she saw him selling marijuana and a "white substance" in 2017.

David denied that he had used illegal drugs in the past 3 years. He called Violet's testimony about seeing him sell drugs "absolutely false." He described how the police came to his work within the 18 months prior to trial because of a telephone call reporting he was "selling drugs out of [his] truck." He denied the allegation and informed the officers that it was probably his "ex-wife" who made the call because of the pending divorce so the officers left. David denied Violet's allegations that he disappeared and used illegal drugs. David recalled that Violet followed him around town with the children in the car in March 2017, so he had to seek police intervention. David began renting the Arizona apartment in 2013 and lived there after Violet initially filed for divorce that year, but "never really had a chance to live there" due to her "filings" that "kept" him "stuck" in Nebraska. At the time of trial in the current divorce case, he was subletting the Arizona apartment. He denied any intention of taking the children to Arizona without court permission.

For discipline, Violet gave "long lectures" and "might slap" one or both children if either or both children were "like, real mouthy." Violet has an adult daughter from a different relationship; Violet's daughter admitted she had a physical altercation with Violet in December 2017, but could not remember whether the parties' children were present for that altercation. Violet did not dispute that she had obtained a protection order against her daughter around that time. Violet said David would "whoop" the children with a belt to discipline them from the time the children were about age 7, 8, or 9, and said such instances happened about "once every three weeks or once every month" or "once every two months" from April 1, 2016, through May 2017 (she denied filing any police report). Violet's daughter said David's discipline of the children (from what she saw last in late 2016) consisted of punching them in their chest, shoulders, and foreheads, and she said that he struck them with shoes, belts, or "whatever he can get his hands on."

Regarding the 15 months before trial, David said that if he had to discipline the children he would talk to them or "separate" the "sibling rivals" and on occasion made them take a "time-out." He said they were "pretty good about listening." Regarding the time he lived with Violet, he said he only spanked his children "maybe once . . . when they were young," and he denied ever using

a belt on them or slapping them. David provided photographs of what he alleged were bruises that the youngest child exhibited after parenting time with Violet. However, David did not make a report to "CPS."

Violet believed the children were respectful up until entry of the Temporary Order in May 2017, at which time they began to change (other witnesses who testified on her behalf generally described the same). David believed his relationship with the children had become "stronger" since they started living with him every other week. He described active outings he had done with the children and the daily structure he set for them. He believed they were respectful. Violet did not believe that anyone cared for the children over the summer of 2018 while they were in David's care and David was at work. David said that his work schedule was flexible and that the children were cared for by Violet's siblings on Saturdays, which was generally a workday for David.

Violet stated she regularly attended school conferences and denied that David had attended them prior to the Temporary Order. She did admit he "might have went to a few" of them more recently. Violet described helping the children with homework, but denied that David helped with homework when he lived in the marital home. There was a homework log to sign every night for the parties' middle child, but Violet noticed it sometimes had no signatures from when that child was in David's care (David said he checks the log as often as the child reminds him). Violet was concerned that the parties' middle child's grades were lower since entry of the Temporary Order. Each child had a notably high amount of absences or late arrivals for the 2015-16 and 2016-17 school years; each party admitted it was a shared responsibility to get the children to school on time during those years.

David stated that for the 6 years prior to trial Violet spoke inappropriately to him in front of the children (Violet's sister testified that she had observed emotional and verbal abuse between the parties for the "majority" of their relationship). According to David, there was a time when he was with the children at his new residence when Violet showed up on his porch "cussing [him] out" in front of the children; he called the police. There were several times when the police showed up to his new residence on Violet's request to check on the children; he denied that the police ever took the children out of his home on any of those occasions. But he described an incident that occurred on May 9, 2017, the day after entry of the Temporary Order, during which Violet "snatched" up one of the children; David said he had to use law enforcement and the court system to retrieve that child. Violet stated she had concerns about her own safety in the marital home, referencing a threat she said David made sometime "[a]fter the protection order was dismissed" to burn the house down (David denied he was planning to set the house on fire).

(b) Plain Error Review

As set forth above, the parties directly disputed each other's testimony relevant to the custody issue in almost every respect. Each alleged that the other parent inflicted different forms of domestic intimate partner abuse in the presence of the children. According to Violet, David's alleged criminal record and continued illegal drug use placed the children in danger, but David denied any use of illegal drugs within the 3 years before trial. Each parent also alleged or at least suggested that the other inflicted some form of child abuse upon one or both children. Further, the parties' testimony differed as to how each parent carried out parenting roles to foster the general health, welfare, and social behavior of the children. Each party admitted they shared responsibility

to some degree regarding the children's high number of school absences/tardiness. While Violet and the witnesses who testified on her behalf generally described how the children's behavior became problematic since entry of the Temporary Order, David indicated that his relationship with the children had only improved since that time and that they were respectful while in his care.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). The district court was in the best position to properly scrutinize and determine the veracity of each parties' version of each of the disputed material issues of fact. From entry of the Temporary Order until entry of the decree (about 1½ years), the parties shared joint physical custody on a weekly alternating schedule. That arrangement was retained under the decree. David testified about his close relationship with and admiration for his children. His testimony regarding how he had parented the children (especially since entry of the Temporary Order) reflected upon his capacity to care for them in a reasonably positive manner. In view of the district court's final custody award, it must have accepted at least some of David's version of the facts over those of Violet and the witnesses who testified on her behalf. On the record before us, we cannot find plain error regarding the joint physical custody award.

### 6. CHILD SUPPORT AND ALIMONY

Violet requests "backpay [sic] for spousal and child support from the date of the divorce filing [on] April 6, 2017." Brief for appellant at 22. She believes David should be ordered to "pay from the time of the filing when he ran off with all of the marital assets and marital monies, and left [her] with $0." *Id.* Under the Temporary Order, $2,207 total monthly income was imputed to each party; the district court did not award temporary child or spousal support. During trial, Violet disputed those income calculations. (We note that for the purposes of child support ordered under the decree, Violet's income was imputed at $1,000 per month, the amount included in her proposed child support calculation which was received into evidence during trial.) She argues that David was "untruthful at the time the income calculations were submitted to the court at the May 8, 2017 hearing." *Id.* at 23. Again, this is a factual matter determined by the district court which we will not reverse on a plain error review.

### 7. SALE OF MARITAL HOME AND ORDER ON DELINQUENT TAXES

Under the Temporary Order, Violet was granted possession of the marital home and was to be "responsible for all associated expenses, maintenance, and upkeep related to the same." Under the final decree, the district court ordered that the marital home be listed for sale on or before January 1, 2020, with "net equity after payment of commissions and any delinquent taxes [to] be divided equally among the parties." Violet was responsible for the continued maintenance of the residence and utilities until the sale of the marital home.

Violet expresses frustration about the ordered sale of the marital home in light of David's ownership of the Arizona apartment and "clear" criminal history and the marital home being a place where she and the children "can live and not worry about a place to stay." Brief for appellant at 17. Although Violet's argument in support of her retaining the marital home for the sake of sheltering herself and the children is reasonable, this was an argument considered by the district

court when balancing other factors favoring the sale of the home. Under our plain error review, we cannot say that leaving the district court's decision uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014).

Violet also argues that David alone should pay the delinquent taxes on the property, claiming that he had promised to pay them "when he first ran off" and that he showed a "greater income on his bank statements than what was shown on his Income Tax Filing[s]." Brief for appellant at 17. A taxpayer information document from the assessor's office relating to the marital home shows about $4,000 due in delinquent taxes as of November 2018, from taxes accrued in 2011, 2014, 2015, 2016, and 2017. Violet does not dispute that these are marital obligations.

Violet's arguments that David had previously said he would pay the taxes and that he had more income than the tax returns revealed are not particularly relevant in determining an equitable division of marital debt. The ultimate test for determining the appropriateness of a property division is reasonableness as determined by the facts of each case. See *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). And given the district court's order that the house be sold, we cannot find plain error in the district court's decision to have the parties equally share the responsibility for the delinquent taxes by deducting the same from the proceeds of the sale of the marital home before splitting any remaining net proceeds equally between the parties.

### 8. LIFE INSURANCE

Violet claims that David has an insurance policy on her, and she wants "every life insurance policy [David] has with her name on it, canceled." Brief for appellant at 18. At trial, Violet was asked, "So you're asking that neither of you hold any life insurance policies on the other party where they are the beneficiary?" Violet responded, "Correct." David testified that he had a life insurance policy on himself and that Violet was "a part of the policy" that was a "term life" policy. Upon further questioning, he admitted that he was insuring Violet's life at the time of trial. He could not remember the amount for which Violet was insured but thought he was insured for "the most." He later answered that the insurance was for himself, "Violet and [the] kids," and agreed that if anybody in the family died, there would be a payout. David stated that the beneficiary "for both of us, for all of us" was the parties' oldest child.

Under the decree, each party was awarded "any life insurance policies in their own name." Violet believes that this language "leads [David] and his insurance company to believe [David] can carry insurance on [Violet] at this present day." *Id.* at 17-18. We agree that the language in the decree is ambiguous, and to leave it uncorrected would result in damage to the fairness of the judicial process. Based upon the discussion at trial on this issue, the award of life insurance policies to each party "in their own name" necessarily was meant to include any policy insuring that party's life. Therefore, any policy insuring Violet's life was awarded to her and any documentation related to the same should be turned over to her for her possession and control, and any decision to maintain and responsibility to pay for such a life insurance policy is left to Violet. Any policy insuring David's life was awarded to him and any documentation related to the same should be turned over to him for his possession and control, and any decision to maintain and responsibility to pay for such a life insurance policy is left to David. The decree is modified accordingly.

Violet improperly requests for the first time on appeal that this court direct David to "produce" an "original [life insurance] application" on allegations that he lied, "saying he was not a felon to attain the life insurance on [Violet] and [the parties'] children." Brief for appellant at 18. See *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigants, like any other, may not present issues, arguments, and theories for first time on appeal). We therefore decline to address this request.

## VI. CONCLUSION

Under a plain error review of the record, we modify the decree regarding life insurance policies, but otherwise affirm the January 16, 2019, decree of the district court.

AFFIRMED AS MODIFIED.