KELLY J. KALKOWSKI, APPELLANT AND
CROSS-APPELLEE, V. TERESA R. KALKOWSKI,
APPELLEE AND CROSS-APPELLANT.

607 N.W.2d 517

Filed March 17, 2000. No. S-99-311.

R. Bradley Dawson, of Clough, Dawson, Piccolo & Jones, for appellant.

Katherine R. Hall, of McCarthy, Gale, Moore & Hall, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Kelly J. Kalkowski has appealed, and Teresa R. Kalkowski has cross-appealed, from an order of the district court for Keith County which dissolved their marriage and adjudicated issues of property division, alimony, child support, and custody. We find no error and affirm the judgment of the district court.

## I. BACKGROUND

Kelly and Teresa were married April 19, 1985, in Ogallala, Nebraska. Their four children were born between November 22, 1987, and July 4, 1995. At the time of the dissolution proceeding, Kelly was 37 and Teresa was 36.

Teresa is a Canadian citizen. She resided in Canada until the age of 14, when she moved to Denver, Colorado, with her mother. After graduating from high school in Denver, Teresa lived in Canada for approximately 2 years and then returned to Denver, where she was working as a secretary when she met Kelly in 1984. She has resided in Ogallala since her marriage to Kelly in 1985. During the marriage, Kelly was engaged in farming and Teresa was the primary caregiver for the children. In accordance with Kelly's wishes, Teresa did not work outside the home after their first child was born. The break-up of the marriage was predicated in part upon Kelly's belief that Teresa was involved with another man, a relationship which Teresa insists was platonic. Kelly initiated the dissolution proceedings.

Teresa testified that the children did not spend much time with Kelly's family except during major holiday gatherings, which Teresa often hosted. Teresa testified that since the commencement of the dissolution proceedings, Kelly's family members have refused to acknowledge her even if the children are present.

Other than her children, Teresa has no family in the United States. Most members of her extended family, which includes parents, siblings, cousins, aunts, and uncles, reside in or near Camrose, Alberta, Canada. She testified that these family members are quite close and gather often. Camrose is a community

of approximately 14,000, located approximately 1,200 miles away, which is a 23-hour drive from Ogallala. Teresa investigated the educational and housing opportunities available in Camrose and found that all of the activities in which the children are involved in Ogallala were also available in Camrose. Additionally, tuition for the children to attend Catholic schools in Camrose is free, while she is paying $80 a month in Ogallala.

Teresa also found that she could purchase a suitable home in Camrose and believes that because of the depressed Canadian economy, her American dollars would be worth more there and she would be left with only a small mortgage. Teresa testified that she wishes to relocate to Canada because she needs to begin a career to ensure financial security for herself and the children. She made arrangements to work at a family business in Camrose where she will have a flexible schedule of a minimum of 24 hours per week and will earn $8.50 per hour in Canadian dollars, or approximately $5.40 per hour in American dollars. She also testified that Camrose has a university which she could attend part time to obtain a degree. Because of the alleged extramarital relationship, she is concerned that her children will be hurt by gossip in Ogallala. Teresa admitted that she has not looked into educational opportunities for herself in other Nebraska communities. She testified that she looked at classified advertisements for jobs in the Ogallala area and determined that the pay was approximately the same as the job she would have in Canada but that the working schedules were not flexible.

Teresa testified that if she were permitted to take the children to Canada, they would be out of school during the months of July and August, and could visit Kelly for 6 weeks during this period. She was also willing to give Kelly visitation at Christmas and over spring break and to set up designated times for telephone visits between the children and Kelly. She testified that while Camrose has an airport, the most economical method of transporting the children for visitation would be to meet Kelly at a location in Montana which is approximately equidistant from Camrose and Ogallala. Teresa further stated that she would be willing to drive the children all the way to Nebraska for visitation with Kelly and would pay either all or half of the cost of transportation. Teresa testified that she would encourage the children to maintain contact with Kelly, including the use of e-mail.

Kelly testified that he had concerns about his children moving to Canada because Teresa does not get along with her mother and her father has a significant health problem. He stated that the children were once in Canada for a month and were anxious to return home. He testified that he enjoys a good relationship with his children, which would be difficult to maintain if they resided in Canada. Kelly testified that he is busy farming during the summer months but could use his mobile telephone to take calls from his children once or twice a week. He expressed a willingness to assume and carry out any and all parental duties.

Shari Shore, a licensed counselor and mental health professional practicing in North Platte, Nebraska, also testified at the hearing. She began seeing the children in June 1998 because Teresa was concerned about how they were adjusting to the dissolution. Shore noticed that when the older children talked about being at Kelly's residence, they primarily talked about having fun. Shore stated that one of the girls was excited about moving to Canada and wanted to give it a try and that her brother was also realistic about the situation and was willing to move. On cross-examination, Shore stated that under optimal conditions, children should have equal access to both parents and that a child's relationship with the father is equally as important as the relationship with the mother. On redirect, however, Shore stated that it was not a realistic goal in this case for both parents to have equal access to the children.

In its decree, the district court awarded custody of all four children to Teresa, but concluded that she had failed to establish that relocation to Canada would be in the best interests of the children and therefore denied her request to remove them from the State of Nebraska. The court further ordered that Kelly should pay child support in the sum of $1,904 per month until the first child reached the age of majority and that Kelly would be entitled to the annual state and federal income tax exemptions for all four minor children provided that he is current on all child support payments as of the last day of each calendar year. The court also ordered that Kelly pay alimony in the sum of $1,000 per month for 60 months. With respect to the division of marital property, the court found that the net marital estate had a value of approximately $196,000 and awarded each party assets valued at approximately one-half of that amount. The

property awarded to Kelly included farm machinery and equipment, growing crops valued at $8,800, and harvested crops in storage valued at $118,171, subject to the indebtedness associated with the farming operation. The property awarded to Teresa included the family home in Ogallala in which she and the children lived, valued at $141,000, subject to the lien of a home loan having a balance of $47,610.02 which was assigned to her. She was also awarded a vehicle, household furnishings and equipment, and a life insurance policy.

Both parties filed motions for new trial which were overruled by the district court. The ensuing appeal and cross-appeal were transferred to our docket on our own motion pursuant to our statutory obligation to regulate the caseloads of the appellate courts. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## II. ASSIGNMENTS OF ERROR

Kelly contends, restated, that the trial court erred in (1) treating the stored and growing crops both as marital assets subject to division and income upon which his child support and alimony obligations are based, (2) determining the amount of his child support obligation, and (3) determining the amount and duration of his alimony obligation. Teresa contends in her cross-appeal, restated, that the trial court erred in (1) not permitting her to relocate to Canada with the parties' children, (2) granting alimony for only 60 months, and (3) awarding Kelly the dependent exemption for all four children.

## III. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999).

## IV. ANALYSIS

### 1. KELLY'S APPEAL

#### (a) Property Division

We initially address Kelly's contention that the trial court erred in treating the growing and stored crops both as marital assets subject to division upon dissolution of the marriage and

as income upon which his child support and alimony obligations are based. We are guided by the principles that the division of property is not subject to a precise mathematical formula and that the ultimate test for determining the appropriateness of such division of property is reasonableness as determined by the facts of each case. *Hajenga v. Hajenga, supra.*

Kelly testified that his harvested crops in storage secure a line of credit which he utilizes in his farming operation and that when the crops are sold, the proceeds are used to reduce the amount of his debt. Based upon these facts, he argues that the trial court should not have treated the crops as a marital asset subject to division and credited to his share of the marital estate, but, rather, should have treated the crops as a "stream of income more equivalent to inventory than to other traditional assets." Brief for appellant at 9. Kelly contends that "[t]he crop asset represents nothing more than a stream of income available to [him] because of his labors." *Id.*

This argument, however, is inconsistent with Kelly's position at trial. Prior to trial, the parties filed a property statement which consisted of a detailed listing of assets and liabilities, the fair market value that each party assigned to each asset, and an indication of those assets which each party asked to be awarded. This list includes property described as "CROPS IN STORAGE (TYPE/QUANTITY X 4) (Petitioner's gross income from crop production during 1998)" and "GROWING CROPS (TYPE/QUANTITY X 4) 296 acres growing wheat." Kelly assigned a value of $118,171 to the stored crops and $8,880 to the growing crops. Teresa assigned the same value to the growing crops, but a value of $214,718.68 to the stored crops. The property statement indicated that Kelly asked to be awarded these assets. On direct examination at trial, Kelly testified at length regarding the various assets listed on the property statement. He was then asked if he wished to make any proposal to the court "respecting the division of assets and assumption of debt." He responded,

> Basically, I would like the — I would like all of the farm assets, basically the equipment, all the growing crops, all the crops in storage, the balance in the checking account, money owed to me by Ron Kalkowski in respect to that.

> I would be willing to let Teresa have the house. I would be willing to let Teresa also have the van pursuant to her paying the remainder of the balance due on it . . . .

Kelly further indicated that he had no objection to Teresa receiving the "lion's share" of the household furnishings. The trial court's distribution of property was generally consistent with Kelly's proposal. In addition, Kelly was awarded Teresa's one-quarter equity interest in Kalkowski, Inc., a family corporation, in addition to the one-quarter interest in the corporation which he had previously held. The record therefore reveals that Kelly requested the district court to treat the crops as a marital asset, which the court did. Generally, a party cannot complain of error which the party has invited the court to commit. *Gustafson v. Burlington Northern RR. Co.*, 252 Neb. 226, 561 N.W.2d 212 (1997); *Hoover v. Burlington Northern RR. Co.*, 251 Neb. 689, 559 N.W.2d 729 (1997).

Moreover, Kelly's argument is inconsistent with our decision in *Venter v. Venter*, 249 Neb. 712, 545 N.W.2d 431 (1996). At issue in that case was whether the trial court erred in treating the husband's business accounts receivable as marital assets, given the fact that upon payment of the accounts, the proceeds were reported as income. The husband argued that his accounts receivable had continued in the same cycle of billing and collection for 11 years and that the trial court therefore erred in treating the receivables as an asset while assuming their eventual payment and resulting realization of income in determining his child support and alimony obligations. In affirming the judgment of the trial court, this court specifically declined "to adopt any rule that expressly permits or denies a trial court's consideration of accounts receivable as a marital asset for division in a dissolution action." *Venter v. Venter*, 249 Neb. at 716, 545 N.W.2d at 433. Instead, we determined that under the "ultimate test" of reasonableness, there was no error in the trial court's distribution of property. *Id.*

Likewise, in this case, we decline to adopt any bright-line rule as to whether or not crops which will eventually generate income may be treated as divisible marital property in a dissolution proceeding. Based upon our de novo review, it is apparent that the principal marital assets were the family home and

furnishings, two personal vehicles, and the assets relating to the farming operation including equipment, crops, and capital stock of Kalkowski, Inc. The district court awarded one vehicle to each party, the home and most of the furnishings to Teresa, and the assets relating to the farming operation to Kelly in accordance with Kelly's wishes. Applying a reasonableness test to these particular facts, we find no abuse of discretion in this division of property.

### (b) Child Support

In general, child support payments should be set according to the Nebraska Child Support Guidelines established pursuant to Neb. Rev. Stat. § 42-364.16 (Reissue 1998). *Rhoades v. Rhoades, ante* p. 721, 605 N.W.2d 454 (2000); *Dueling v. Dueling*, 257 Neb. 862, 601 N.W.2d 516 (1999). The guidelines provide that in calculating the amount of support to be paid, the court must consider the "Total Monthly Income," defined as the "income of both parties derived from all sources, except all means-tested public assistance benefits and payments received for children of prior marriages." Nebraska Child Support Guidelines, paragraph D. All orders for child support shall be established in accordance with the Nebraska Child Support Guidelines, unless a court finds that one or both parties have produced sufficient evidence to rebut the presumption that the application of the guidelines will result in a fair and equitable child support order. § 42-364.16; *Dueling v. Dueling, supra.* A parent who believes that the inclusion of certain income would be unjust or inappropriate may rebut the presumption by offering evidence in support of his or her position that a deviation from the guidelines is warranted for that reason. *Id.*

In this case, the trial court determined, on the basis of tax returns for the years 1996 through 1998, that Kelly had an average monthly income of $4,973, and calculated his child support obligation in accordance with the child support guidelines. Based upon our de novo review, we conclude that Kelly did not meet his burden of proving any portion of his actual income should not have been considered for purposes of calculating child support or that any other deviation from the child support guidelines was warranted.

### (c) Alimony

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997); *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994). In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Priest v. Priest*, 251 Neb. 76, 554 N.W.2d 792 (1996); *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995). The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994). Factors which should be considered by a court in determining alimony include: (1) the circumstances of the parties; (2) the duration of the marriage; (3) the history of contributions to the marriage, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities; and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Reichert v. Reichert, supra.*

This was a marriage of almost 14 years' duration which produced four children ranging in age from 3 to 11 at the time of dissolution. The evidence established that much of Kelly's time was occupied with farming and that as a result, Teresa was the primary caregiver of the children. It is apparent from the record that Teresa will have a period of adjustment during which she will need to find a means of generating an income in addition to caring for the children on a daily basis. Based upon our de novo review, we find no abuse of discretion in the award of alimony in the amount of $1,000 per month for 60 months.

### 2. TERESA'S CROSS-APPEAL

### (a) Denial of Leave to Relocate Children

To prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the

court that he or she has a legitimate reason for leaving the state. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). If a legitimate reason is shown, the custodial parent must next demonstrate that removal is within the child's best interests. *Id*. Whether a proposed move is in the best interests of the child is the paramount consideration. *Farnsworth v. Farnsworth, supra*; *Evenson v. Evenson*, 248 Neb. 719, 538 N.W.2d 746 (1995). In determining whether a proposed relocation is in the child's best interests, trial courts should consider each parent's motives for seeking or opposing the move; the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and the impact such a move will have on contact between the child and the noncustodial parent, viewed in the light of reasonable visitation arrangements. See *Farnsworth v. Farnsworth, supra*.

The trial court's determination in this case was made prior to the release of our opinion in *Farnsworth*. The trial judge determined that Teresa had not established that "the best interests of the minor children would be achieved by moving them to a location in Canada approximately 1200 miles from Keith County, Nebraska." Noting that Teresa had resided in the United States on a nearly continuous basis since she was 14 years of age, except for a period of 1½ to 2 years immediately following her graduation from high school, the court determined that she had made no investigation as to educational or employment opportunities either in Keith County or elsewhere in Nebraska as an alternative to relocation. The court further determined that the relationship between Kelly and his family and the children would be "seriously jeopardized" if Kelly were able to see the children on only two or three occasions per year, and noted that the expert called by Teresa testified that it would be best if both parents can coparent and remain active in the children's lives.

The trial court did not make a specific finding as to whether Teresa had established a legitimate reason for her proposed relocation. In reviewing this question de novo, it appears her principal reasons for wishing to relocate to Canada are her desire to be near her extended family and her plan to pursue edu-

cational and employment opportunities there. While it is true that she did not investigate educational opportunities in Nebraska and conducted only a limited investigation of employment opportunities in this state, we have never required a custodial parent to exhaust all possible job leads locally before securing a better position in another state. *Farnsworth v. Farnsworth, supra*. We have also stated that absent some aggravating circumstance, such as an ulterior motive to frustrate the noncustodial parent's visitation rights, significant career enrichment is a legitimate reason for relocation in and of itself. *Id.* We conclude that Teresa's firm offer of employment with a flexible schedule in close proximity to her extended family constitutes a legitimate reason for her proposed relocation to Canada. We therefore focus our de novo review on whether she has established that such relocation would be in the best interests of the children, a question which the trial court resolved in the negative.

In assessing each parent's motives, we conclude that both Teresa and Kelly have valid motives for taking their respective positions on the issue of relocation. Teresa's reasons for relocating are as stated above, and there is no indication that she seeks to frustrate Kelly's visitation rights. Kelly, on the other hand, has legitimate concerns about the effect relocation across an international boundary and 1,200 miles from his home would have on his relationship with his children and, in particular, his ability to maintain regular and frequent contact with them. The motives of each party are thus equally balanced.

As to the potential which the relocation holds for enhancing the quality of life of Teresa and her children, pertinent factors include: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinions or preferences as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the

custodial parent because the best interests of the children are interwoven with the well-being of the custodial parent. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Although there is evidence that the move could potentially enhance the children's standard of living, it is not overwhelming. Moreover, any potential enhancement would be dependent to a great extent upon the children's ability to adapt to new surroundings, new friends, and an extended family with whom they have never had a relationship other than periodic visits. The likelihood of a successful adaptation by all of the children is difficult to predict.

We conclude that the question turns on the third *Farnsworth* consideration, i.e., the impact of relocation upon the ability of Kelly to maintain a meaningful relationship with his children. In *Farnsworth*, we noted that while a move from Omaha to Denver would necessarily lessen the frequency of visits with the child, the distance between the two cities was not one which would prevent the noncustodial parent from seeing his child on a regular basis. The same cannot be said of the distance between Ogallala, Nebraska, and Camrose, Alberta, Canada. The greater distance, less direct travel connections, and the significant expense and time involved in traveling between the two locations are significant factors which the trial court properly considered. As we stated in *Farnsworth v. Farnsworth*, 257 Neb. at 255, 597 N.W.2d at 601:

> Parental relocation issues are among the most difficult issues that trial courts face in postdivorce proceedings. Once broken by divorce, a family cannot be put back together in precisely the same way. Among other things, the relationships between the child and each of the parents and the parents to each other are necessarily different. As such, it is often difficult for courts to balance the noncustodial parent's accustomed close involvement in a child's everyday life with the custodial parent's chance to embark on a new or better life or to form a new family unit. It is for this reason that such determinations are matters initially entrusted to the discretion of the trial judge, and the trial judge's determination is to be given great deference absent an abuse of discretion.

Based upon our de novo review of the record, we conclude that the district court did not abuse its discretion in concluding that the relocation would not be in the best interests of the children because of its potential negative impact upon their relationship with Kelly.

### (b) Alimony

While Teresa does not challenge the amount of monthly alimony awarded by the trial court, she argues that its duration is insufficient and should have extended to at least September 2005, which is 4 years past the date the youngest of the four children would enter the first grade. Applying the factors mentioned above in connection with our review of Kelly's assignment of error with respect to alimony, we conclude upon de novo review that the trial court did not abuse its discretion in awarding alimony for a period of 60 months.

### (c) Dependency Exemptions

 Under Nebraska law, a state court having jurisdiction in a dissolution action has the power to allocate tax dependency exemptions as part of the dissolution decree. *Hall v. Hall*, 238 Neb. 686, 472 N.W.2d 217 (1991). In the present case, the district court awarded all dependency exemptions to Kelly, provided that he is current on his child support payments as of December 31 of each year.

 A tax dependency exemption is nearly identical in nature to an award of child support. *Hall v. Hall, supra.* The dependency exemption for income tax returns is an economic benefit. *Prochaska v. Prochaska*, 6 Neb. App. 302, 573 N.W.2d 777 (1998). Based on these propositions, Teresa argues that there is nothing in the record which would support the award of exemptions to Kelly and that the district court therefore abused its discretion in making the award.

Teresa's argument fails to correctly consider the mathematical computations involved with dependency exemptions and calculations of child support income. The district court's child support calculations indicate that in arriving at the amount of Kelly's income available for support, it first considered his adjusted gross income as reflected on his tax returns and then,

pursuant to the child support guidelines, added back the amounts of depreciation claimed in each return. It then subtracted the amount of state and federal income tax paid by Kelly in arriving at his net income for child support purposes, averaging the net amount over a 3-year period. The taxes deducted were computed by taking into account the exemptions for all four children.

This mathematical analysis reveals that awarding Kelly the dependency exemptions results in increasing the amount of his income for the purposes of calculating child support. The dependency exemptions decrease the amount of federal and state income tax Kelly pays, resulting in an increase in his net income for purposes of calculating child support and a concomitant increase in the amount of tax-free child support income that Teresa receives each month. See *Kriesel v. Gustafson*, 513 N.W.2d 9 (Minn. App. 1994). In addition, the district court's child support calculation reflects that Kelly will be providing 91 percent of the children's monthly support. We therefore conclude that the district court did not abuse its discretion in awarding the exemptions to Kelly.

### 3. ATTORNEY FEES ON APPEAL

Both parties have filed motions pursuant to Neb. Ct. R. of Prac. 9F (rev. 1999) requesting an award of attorney fees on appeal. Customarily in dissolution cases, attorney fees and costs are awarded only to prevailing parties or assessed against those who file frivolous suits. *Ryan v. Ryan*, 257 Neb. 682, 600 N.W.2d 739 (1999). In the present case, neither party prevailed with respect to the issues on which they sought appellate review, and neither the appeal nor the cross-appeal was frivolous. Accordingly, we conclude that each party should be responsible for paying his or her own attorney fees on appeal and deny both motions.

## V. CONCLUSION

For the reasons discussed above, we conclude on the basis of our de novo review that the district court did not abuse its discretion in dividing the parties' marital property; in denying Teresa's request to relocate to Canada with the parties' children;

or in awarding child support, alimony, and tax exemptions. Accordingly, we affirm the judgment of the district court and deny each party's motion for attorney fees on appeal.

AFFIRMED.