IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

GLOVER V. GLOVER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SARAH K. GLOVER, APPELLANT,

V.

PAUL G. GLOVER, APPELLEE.

Filed November 15, 2022.    No. A-21-958.

Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Reversed and remanded with instructions.

Brent M. Kuhn and Haley L. Cannon, of Brent Kuhn Law, for appellant.

Caitlin R. Lovell, of Johnson & Mock, P.C., L.L.O., for appellee.

MOORE, RIEDMANN, and WELCH, Judges.

MOORE, Judge.

I. INTRODUCTION

Sarah K. Glover and Paul G. Glover were divorced in 2020, and Sarah was awarded sole legal and physical custody of the parties' minor child. Sarah subsequently filed a request in the district court for Sarpy County, seeking to remove the child from Nebraska. Sarah appeals from the court's denial of her request. In our de novo review of the record, we find that the district court abused its discretion in denying the request. We reverse the order of the district court and remand with instructions to grant Sarah's complaint for removal.

II. STATEMENT OF FACTS

The parties were married in May 2015. They have one child, Julietta, born in November 2017. Paul is not Julietta's biological father. The parties used a sperm donor, and Paul signed all the paperwork to be Julietta's legal father.

- 1 -

In June 2020, Sarah filed an amended complaint for dissolution of marriage. Sarah's pleading included a request for removal of Julietta to Oregon.

Prior to dissolution of the parties' marriage, Paul was charged with and pled guilty to a federal crime involving child pornography. Paul received a sentence of 42 months' incarceration, and he began his incarceration at a federal facility in Minnesota on January 20, 2021.

The divorce trial was held before the district court on November 13, 2020. Although Sarah attempted to introduce evidence at trial regarding removing Julietta from Nebraska, as a discovery sanction, the court refused to hear such evidence.

On November 25, 2020, the district court entered a decree of dissolution, awarding Sarah sole legal and physical custody of Julietta. The court awarded Paul certain supervised parenting time with Julietta, as well as certain phone contact, prior to the start of his incarceration. While incarcerated, Paul was to have up to three video communication visits with Julietta per week (or three telephone calls of up to 15 minutes each if video communication was not available). Paul was also allowed to send letters and cards to Julietta, and Sarah was to keep Paul informed of her address to facilitate such communication. The court specified that Paul's release from incarceration would be considered a material change in circumstances, and it denied without prejudice Sarah's request to remove Julietta to Oregon, stating that Sarah shall continue to reside with Julietta in Nebraska until further order of the court. The court ordered Paul to pay child support of $50 per month beginning January 1, 2021, and specified Sarah's responsibility for work-related childcare, preschool, and school expenses for Julietta; and it set forth Sarah's responsibility to maintain health insurance for Julietta and pay for her nonreimbursed health care costs (although Paul was to pay a certain portion of these costs prior to January 20, 2021).

On December 3, 2020, Sarah filed a motion to alter or amend the decree, alleging, among other things, that having up to three video visits per week with Paul while he was incarcerated was contrary to Julietta's best interests and that phone calls of 5 to 10 minutes, rather than 15 minutes, was reasonable and in Julietta's best interests, considering her age and the evidence offered at trial.

On February 1, 2021, the district court entered an amended decree of dissolution, partially amending the decree in several regards. As relevant to the present appeal, it amended the start date for Paul's child support obligation and Sarah's sole responsibility for work-related childcare and preschool and school expenses to February 1, but it did not amend any of the above-referenced parenting time provisions set forth in the original decree. The court entered an order nunc pro tunc on February 5 in order to correct a scrivener's error in the amended decree.

On March 22, 2021, Sarah filed a complaint for removal, seeking to remove Julietta from Nebraska to "the Vancouver area of Washington State and Oregon." She alleged that she had a legitimate reason for her request and that removal to the Washington and Oregon area was in Julietta's best interests. She also stated that she sought a modification of the decree to provide for Julietta's removal.

Subsequently, Paul filed a motion to dismiss, which the district court denied. The court noted its dismissal of Sarah's prior request for removal at the time of the dissolution proceedings, but it observed that such a decision based on a discovery sanction should not prevent Sarah from filing a separate action for removal. The court also noted its intent at the time of the dissolution proceedings to allow such a future pleading by Sarah. However, the court found that Sarah's pleading was clearly a complaint to modify, and it stated, "[a]s such, [Sarah] must follow standard

procedure and identify what the change in circumstances are in order to provide [Paul] with proper notice in which to defend himself." The court gave Sarah 5 days to file an amended pleading.

On May 11, 2021, Sarah filed an "Amended Complaint to Modify Decree for Removal." She again sought removal of Julietta from Nebraska to the Vancouver area. Additionally, she alleged that since entry of the decree there had been a material change of circumstances warranting modification of the decree; that her legitimate reasons for removal included opportunities for her career and financial advancement, the emotional and financial support of local family not available in Nebraska, and removal to a new jurisdiction to avoid stigmatizing Julietta as a result of Paul's wrongful conduct in Nebraska; and that removal was in Julietta's best interests. In connection with her best interests allegations, Sarah noted the factors to be considered by the court and alleged that these factors weighed in favor of removal. Beyond requesting permission to remove Julietta to the Vancouver area of Washington and Oregon, Sarah did not request any other modification to the decree.

Paul filed an answer to Sarah's amended complaint, denying the allegations, and affirmatively alleging that the allegations were known to Sarah at the time of the dissolution trial, that there was no material change in circumstances justifying removal, and that removal of Julietta from Nebraska would frustrate his parenting time.

In June 2021, Sarah filed a motion seeking an expedited trial, alleging that she had a job offer as a registered nurse in the neonatal intensive care unit (NICU) at a particular hospital in Washington. She stated that she wanted to accept the job offer and relocate to the Vancouver area of Washington and Oregon in a reasonable time for her career and financial advancement, which was in Julietta's best interests. The district court granted her motion and trial was scheduled for September 29. On September 16, Paul filed a motion to continue trial for additional time to conduct discovery, which the district court denied. However, at the hearing on Paul's motion to continue, his attorney informed the court of her scheduled test due to symptoms of COVID-19, and the relocation trial was subsequently rescheduled for October 6.

The removal trial was held before the district court on October 6 and 7, 2021. The court heard testimony from the parties, as well as Paul's mother, and received various documentary exhibits into evidence.

Sarah was born in the Vancouver area and lived there until 2011 (excluding a period of a couple of years when she lived in Minnesota as a young child). At the time of the parties' divorce, Sarah was employed as a registered nurse working at a children's hospital in Omaha. She worked 40 hours per week, Monday through Friday from 8 a.m. to 4:30 p.m., and earned approximately $30 per hour. By the time of the relocation trial, she was earning around $35 per hour. Her benefits included health and life insurance. An exhibit detailing the compensation and benefits for her present job was received into evidence.

Sarah testified about her search for job opportunities in both Vancouver, Washington, and Portland, Oregon, where she would have "additional family support" for longer work shifts. In particular, she was interested in NICU nursing positions. Around June 4, 2021, Sarah received a job offer for a NICU position at a hospital in Vancouver. According to Sarah, the offered job would require her to work approximately 60 hours every 2 weeks (alternating between two and three 12-hour shifts weekly) and she would earn approximately $59 per hour. The work shifts would be from 6:30 p.m. to 7 a.m. The offered job also included health insurance, and she thought the cost

for her contribution toward health insurance would be about $50 less per paycheck than what she was required to pay in Nebraska. An exhibit with details about Sarah's job offer and its benefits was received into evidence. The initial anticipated start date for the offered job was August 2, but due to the "situation in this case," the offer had been extended to October 25. Sarah intended to accept the job if allowed to move.

Sarah had not looked for different employment in Nebraska since the dissolution trial, and she had not received any offers of employment that were comparable to the offered job in Vancouver. She knew that there were about 300 open positions with her current employer, but she did not know what the pay was for any of those positions. Before working in her current nursing position, Sarah had a night shift NICU position at a Nebraska hospital. She did not know what the current pay was for a NICU nurse at that hospital, although she had spoken to one of her coworkers and learned that the current pay "was pretty comparable" to what she "was making previously." She also testified that with her current support system in Nebraska, she did not have the ability to work 12-hour overnight shifts. Another advantage noted by Sarah was that there was no state income tax in Washington. Sarah's 2020 income tax return received into evidence shows that she paid $1,242 in Nebraska state income tax.

Additionally, Sarah has a side business, decorating and selling sugar cookies, for which she receives some compensation. Sarah thought that the work schedule for the offered job would allow her to further develop that business. She offered an exhibit that included information about costs and sales associated with her cookie business, but the district court did not receive that portion of the exhibit into evidence.

At the time of trial, Sarah lived in a one-bedroom apartment in Omaha, paying rent of $1,020 per month. Sarah investigated the cost of apartments in the Vancouver area, by researching online, and she also visited a few apartment locations when she and Julietta were in the Vancouver area in July 2021. If allowed to move, she intended to rent a two-bedroom apartment so that Julietta could have her own room, and she testified that the "going rate" for two-bedroom apartments in the Vancouver area was about $1,500 to $1,800 a month. Sarah had not signed a lease for an apartment in the Vancouver area as of the time of trial, but she testified that she had submitted an application and had been told that there would be an opening in early December in the apartment complex in which she was most interested.

At the time of the relocation trial, Julietta was in daycare from about 7:15 a.m. to 5 or 5:30 p.m. on weekdays. On occasions when Sarah has to work overtime, she has her mother pick Julietta up because the daycare facility closes at 6 p.m. Sarah pays $235 a week in work-related daycare expenses. According to Sarah, since her offered job was for night shifts, Julietta would be sleeping the majority of the time Sarah would be working, and Sarah would have "a lot more . . . nonsleeping hours with her." Sarah testified that if allowed to move, Julietta would be cared for by her parents or other family members, when not in age-appropriate schooling, which would be "a help" financially. Sarah also testified that "more time with family versus in a day care setting," would benefit Julietta both developmentally and emotionally. She had submitted a deposit to hold a place for Julietta in a daycare facility.

At the time of trial, Julietta had not yet turned 4 years old and was not yet in preschool, but Sarah testified that if allowed to move, she would enroll Julietta in preschool. During their July 2021 visit to the Vancouver area, Sarah and Julietta toured three different preschools. Sarah's

exhibit showing the cost for two of those preschools as well as her testimony as to the cost was excluded from evidence based on Paul's objections, but her attorney made an offer of proof, during which Sarah testified that the cost for the "top frontrunner" of the preschools she looked at would be about $1,200 per month.

There was evidence at trial about Sarah's extended family both in Nebraska and the Vancouver area. Sarah's parents lived in Nebraska at the time of the relocation trial, but she testified that they were planning to move back to the Vancouver area soon. Sarah testified that she has about 35 family members who are living in Portland, Oregon, which is across the river from Vancouver, and within an hour and a half of the Washington area. Sarah believed that one reason removal to the Vancouver area was in Julietta's best interests was because Sarah would have the support of multiple family members. Sarah testified that although Julietta has only had the opportunity to visit her extended family in the Vancouver area twice (once when she was a baby and again for 10 days in July 2021), Julietta has formed relationships with all of these family members via video communication calls. Some of Sarah's family members have also visited Nebraska several times. According to Sarah, Julietta has formed really close relationships with these family members, is comfortable around them, and enjoys her time with them.

Sarah testified about her concern that Julietta would be stigmatized in Nebraska due to Paul's criminal actions, but she admitted that an internet search for information about Paul could be conducted just as easily outside of Nebraska. Sarah denied filing the removal request in order to deny Paul's parenting time with Julietta or to punish Paul. If allowed to move, Sarah was willing to discuss with Paul possible solutions to ensure he received his parenting time with Julietta as "allowed under his stipulations" upon his release from prison.

At the time of the relocation trial, Paul was incarcerated at a federal facility in Minnesota, serving a sentence of 42 months. He testified that "with good time" his expected release date was January 10, 2024, but that he would be eligible for "home confinement" around September 9, 2023. He did not yet know what home confinement would require, but he planned to spend his home confinement at his mother's residence in Omaha. As a result of his conviction for a federal crime involving child pornography, Paul will be required to register as a sex offender for 25 years. He will also have a period of 5 years of supervised release through federal probation. He did not know what the terms of his supervised release would be, but he anticipated needing permission to travel outside of Nebraska and possibly being required to check in with law enforcement at any travel destinations. Prior to Paul's incarceration, he was employed at a bakery, and he testified that the owners were willing to rehire him upon his release.

The facility where Paul is incarcerated does not provide video communications, so all of Paul's contact with Julietta since his incarceration has been by phone. The record shows that although the parties had some initial difficulties in scheduling the phone calls, they were able to communicate and reach a better schedule. Paul initiates the phone calls, and he expressed frustration about the "numerous" times Sarah has not answered the phone, and he has to call back more than once to reach her. If Sarah does not answer the phone, Paul may have to wait in line to call back. Sarah admitted there are occasional times when she does not hear the phone or is not able to answer it. And, if she and Julietta are running errands and are not yet home when the call time arrives, Sarah does not like to answer calls from Paul in public "when it says very loudly the call is coming from a federal prison."

Sarah testified that Paul has received his three calls per week since his incarceration, that any missed calls have been rescheduled and "made up," and that she undertakes reasonable efforts to ensure she is available for each of their scheduled call times. Paul agreed that, at the time of his testimony, he was receiving three calls per week. He estimated that more than five calls were "missed completely," although he agreed that some of those had been rescheduled. The court received into evidence Sarah's log of calls between Paul from the prison to her phone.

Due to Julietta's age, it is difficult for her to concentrate during calls, and Sarah testified that Julietta still resists participating in the calls at least once a week. The record shows that while certain times of day might work better for Paul or Julietta, those are not necessarily times that work well for Sarah. Sarah indicated that scheduling phone calls for an earlier time is difficult given her present work schedule, but that the time difference between Nebraska and the Vancouver area and the schedule for the offered job would facilitate having earlier calls.

Paul and Julietta enjoy reading a book together during their phone calls. Paul's mother purchased both Paul and Julietta copies of certain books that they could read together during calls. When Paul wants to read a particular book during a call with Julietta, he arranges that ahead of time. He expressed frustration that Sarah does not always have the prearranged book readily available at the time of a call. He also expressed frustration about times Sarah has scheduled activities (visits to the park or pool, playtime with Paul's nephews) during calls so that Julietta ends up being upset or distracted during the call. Sometimes his calls occur during times when Julietta is visiting Paul's mother, and Paul and his mother both testified that Julietta responds positively when this happens.

Sarah agreed that the parties "for the most part" have been able to communicate about parenting issues, but she expressed frustration that Paul wants all communication to go through his mother and has not provided Sarah with his email address so that she can send him updates about Julietta rather than discussing issues during his parenting time phone calls. According to Paul, however, he and Sarah occasionally talk when Julietta is doing things like retrieving a book.

Paul testified that he has a good relationship with Julietta. He described Julietta as "amazing," "energetic," "a joy to be around," and "[his] everything." Paul has sent one card for Julietta to Sarah's address since his incarceration and had sent approximately five or six cards and letters for her to his mother's address. Before his incarceration, he took Julietta to a business where they "built a teddy bear for her with a recording of [his] voice." Paul also purchased gifts for his mother to give Julietta during his incarceration. Paul was current on his child support at the time of the relocation trial.

Paul's mother and sister (married with two children) live in Omaha, and Sarah takes Julietta to spend time with them. Paul's mother sees Julietta once or twice a month and has a good relationship with her. She described Julietta as "extremely friendly" and "self-confident." She described Julietta's relationship with her cousins (children of Paul's sister) as a "close" one of "[m]utual adoration." Paul's mother also described Sarah's relationship with Paul's extended family as "good." She agreed that Sarah is a "good mom" and "does a good job of caring for Julietta." Sarah testified that she would support a continued relationship between Julietta and Paul's family if allowed to move.

On November 4, 2021, the district court entered an order of modification, denying Sarah's request for removal with prejudice. In denying her request, the court stated:

[Sarah] has failed to show a material change of circumstances that warrants a modification. [Paul's] incarceration and lack of physical contact with Julietta are not a material change in circumstances. On its own, [Sarah's] job offer is not a material change in circumstances-any material change must be in the best interests of the child. [Sarah] has not demonstrated an out-of-state job is in Julietta's best interests.

[Sarah] has also failed to meet her burden of proof regarding removal. Any evidence adduced by [Sarah] regarding potential employment or financial benefits of moving to Washington is speculative. Further, [Paul] adduced evidence of [Sarah's] ulterior motive in interfering with [Paul's] parenting rights. [Sarah] also failed to show relocating to Washington is in Julietta's best interests.

We have set forth further details of the court's analysis of the removal factors below.

## III. ASSIGNMENTS OF ERROR

Sarah asserts that the district court erred in (1) failing to find that Sarah had demonstrated the necessary material change in circumstances required to warrant a modification of the decree, (2) finding that Sarah had failed to show a legitimate reason for her request for removal, (3) failing to find that removal from Nebraska was in Julietta's best interests, and (4) dismissing Sarah's complaint to modify with prejudice.

## IV. STANDARD OF REVIEW

Relocation and child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Vyhlidal v. Vyhlidal*, 309 Neb. 376, 960 N.W.2d 309 (2021). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

## V. ANALYSIS

### 1. MATERIAL CHANGE IN CIRCUMSTANCES

Sarah first asserts that the district court erred in failing to find that she had demonstrated the necessary material change in circumstances required to warrant a modification of the decree. Although she does not challenge the court's requirement that she prove a material change in circumstances in addition to the requirements for removal discussed further below, we find plain error in that regard. See *North Star Mut. Ins. Co. v. Miller*, 311 Neb. 941, 977 N.W.2d 195 (2022) (plain error is error plainly evident from record and of such nature that to leave it uncorrected would result in damage to integrity, reputation, or fairness of judicial process).

In its May 2021 denial of Paul's motion to dismiss, the district court characterized Sarah's initial post-dissolution removal request as a complaint to modify the decree and stated that she would be required to identify the change in circumstances warranting such modification. Sarah filed an amended complaint. In its order denying Sarah's amended request for removal, describing the procedural background of this case, the court made the following statements about Sarah's amended request: "While [Sarah] globally alleged a material change in circumstances, this Court

will note the procedural defect in [her] pleading. Despite the Court's May 6, 2021 order, [Sarah] did not identify any material change in circumstances in her [a]mended [c]omplaint." The court noted the reasons for removal alleged by Sarah in her amended request and stated that her allegations were "identified as legitimate reasons to relocate, not as a material change in circumstances." In its analysis, the court observed that "[t]he party seeking modification of child custody - here, [Sarah] - has the burden of showing a material change in circumstances." The court went on to conclude that Sarah had failed to show a material change in circumstances warranting a modification of the decree.

Pursuant to the decree, Sarah was awarded sole legal and physical custody of Julietta. Contrary to the district court's findings, Sarah's post-dissolution requests for removal did not ask to modify the parties' custody of Julietta. Sarah's original post-dissolution request was captioned as a complaint for removal, and although she stated in the body of the pleading that she was seeking modification of the decree to provide for removal, she did not state anywhere in the pleading that she was seeking to modify Julietta's custody or Paul's parenting time with her. Likewise, her amended pleading was captioned as an amended complaint to modify decree for removal, and as required by the court, she stated that since entry of the decree there had been a material change in circumstances warranting a modification of the decree. But, nowhere in the amended pleading did she request a change in Julietta's custody or Paul's parenting time. The only relief she sought in either post-dissolution request was permission to remove Julietta from Nebraska to the Vancouver area of Washington and Oregon. See, *Gerber v. P & L Finance Co.*, 301 Neb. 463, 919 N.W.2d 116 (2018) (when title of filing does not reflect its substance, it is proper for court to treat pleading or motion based on its substance rather than its title); *Lisec v. Lisec*, 24 Neb. App. 572, 894 N.W.2d 350 (2017) (character of pleading is determined by its content, not by its caption). Here, the court should have treated Sarah's post-dissolution pleading simply as a request by a custodial parent to remove a child from Nebraska.

We also disagree with the district court's assertion that Sarah needed to prove a material change in circumstances absent any request by either party to modify custody or parenting time. Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). However, in connection with requests by custodial parents to remove a child to another jurisdiction, Nebraska case law does not impose such a requirement.

Before a custodial parent can remove a child from the state, permission of the court is required. See *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020). After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.*

In contrast, in cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. *Taylor-Couchman v. DeWitt-Couchman*, 29 Neb. App. 950, 964 N.W.2d 320 (2021). If this burden is met, then the court must make a determination of whether

removal from the jurisdiction is appropriate. *Id.* And, when a parent sharing joint legal and physical custody seeks to modify custody and relocate, that parent must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so. *Speers v. Johns*, 26 Neb. App. 889, 923 N.W.2d 777 (2019), *disapproved on other grounds, Fichtl v. Fichtl*, 28 Neb. App. 380, 944 N.W.2d 516 (2020). Once the party seeking modification has met the threshold burden of showing an expressed intention to leave the state, the separate analyses of whether custody should be modified and whether removal should be permitted necessarily become intertwined. *Id.*

Here, we simply have a request by a sole custodial parent to remove a child from Nebraska to another state. As the custodial parent making such a request, Sarah pled that she had a legitimate reason for leaving the state and that removal was in Julietta's best interests. Neither party sought a modification in custody or parenting time. And, under the circumstances of this case, Sarah's request for removal, at the time it was made, did not necessitate a change in custody or parenting time.

The district court erred in finding that this case involved a request by a party to modify custody and in requiring Sarah to plead a material change in circumstances in addition to the removal requirements (legitimate reason for removal/best interests), which Sarah did plead. We need not further address the court's finding that Sarah did not prove such a material change in circumstances and turn to Sarah's remaining assignments of error relating to her request for removal.

## 2. REMOVAL FROM JURISDICTION

The Nebraska Supreme Court has observed that custody cases involving parental relocation are among the most difficult and troubling for courts to decide. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). Because the parent proposing the move in a parental relocation has constitutional rights to travel between states and to migrate, resettle, find a new job, and start a new life, an award of custody is not and should not be a sentence of immobilization. *Id.* Yet, a custody order should also heed both parents' constitutional rights to the care, custody, and control of their child, as well as the child's need for a stable, healthy environment. *Id.*

To aid in settling parental relocation matters, appellate courts have devised a two-part framework that trial courts should use to evaluate whether to grant a request for removal. *Id.* Under the two-part framework that trial courts should use to evaluate whether to grant a request for removal to another jurisdiction, the custodial parent proposing to move the child must first satisfy the court that he or she has a legitimate reason for leaving the state. *Id.* After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her after the proposed move. *Id.* While both of these prongs must be shown to support a removal request, the second prong is of paramount concern. *Id.*

### (a) Legitimate Reason to Leave State

Sarah's stated reasons for seeking to move Julietta to the Vancouver area were opportunities for career and financial advancement, the emotional and financial support of family in the Vancouver area, and the desire to avoid stigmatizing Julietta due to Paul's wrongful conduct in Nebraska. Paul argues Sarah's ulterior motive to frustrate his parenting time is an aggravating

factor that negates any legitimate reason to leave Nebraska. In our de novo review, we find Sarah's motivations to move Julietta are legitimate.

While living in Nebraska, Sarah has worked as a registered nurse earning around $35 per hour for a 40-hour week. She and Julietta live in a one-bedroom apartment. Sarah was interested in returning to a NICU nursing position, but she did not search for other nursing jobs in Nebraska, testifying that with her limited support system in Nebraska, she would not be able to work longer 12-hour shifts. She wants to move to the Vancouver area where she has a large family support system. She had a verified job offer as a NICU nurse with a particular hospital in Vancouver, which would provide her with higher pay while working fewer hours. At the time of the removal trial, her job offer was set to expire on October 25, 2021. Paul was incarcerated in an out-of-state federal facility until January 2024 and was not eligible for home confinement until September 2023, which he expected to spend in Nebraska.

In finding that Sarah had not met her burden of proving a legitimate reason to leave Nebraska, the district court stated that "[w]hile [Sarah] may have been offered a higher-paying job, she presented no evidence whatsoever that she even *attempted* to find a better-paying job in Nebraska." (Emphasis in original.) However, a custodial parent is not required to exhaust all possible job leads locally before securing a better position in another state. *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013).

In *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000), the Nebraska Supreme Court discussed the issue of exploring job opportunities locally before seeking employment in another state. In that case, the custodial mother had not made any attempts to secure employment locally. The Court stated:

> While it is true that [the custodial mother] did not investigate educational opportunities in Nebraska and conducted only a limited investigation of employment opportunities in this state, we have never required a custodial parent to exhaust all possible job leads locally before securing a better position in another state. *Farnsworth v. Farnsworth*, [257 Neb. 242, 597 N.W.2d 592 (1999)]. We have also stated that absent some aggravating circumstance such as an ulterior motive to frustrate the noncustodial parent's visitation rights, significant career enrichment is a legitimate reason for relocation in and of itself.

*Kalkowski*, 258 Neb. at 1046, 607 N.W.2d at 526.

The Court in *Kalkowski* concluded that the custodial mother's firm offer of employment with a flexible schedule in close proximity to her extended family constituted a legitimate reason for her proposed relocation to Canada. *Id*. See, also, *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000) (custodial parent's firm offer of employment with flexible schedule in close proximity to custodial parent's extended family constitutes legitimate reason to leave state in removal case). Similarly, in the present case, Sarah presented evidence of a firm offer of employment, with higher wages and a more advantageous schedule, in close proximity to her extended family who could assist with daycare for Julietta.

The district court also found that Sarah failed to present evidence of cost-of-living differences between Nebraska and the Vancouver area, that she had not yet chosen a daycare for Julietta and did not know what school district she would live in, and that she presented no evidence regarding beneficial differences in various necessaries of life such as rent, utilities, and groceries.

The court cited *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005), where this court found that a parent had not shown a legitimate reason to leave the state.

In *Wild*, the evidence did not show that the parent's new job offered any opportunity for career or salary advancement. Although there was evidence of an increase in the parent's salary, the parent did not present evidence about cost-of-living differences between Nebraska and Ohio, and the evidence showed that the salary increase would be consumed simply by the increased transportation costs in bringing the child back to Nebraska for parenting time with the noncustodial parent. The parent's new job was an entry-level position from which she could be terminated at any time, and she did not testify as to any benefits or advantageous schedule provided by the new job. Finally, the parent seeking removal in that case did not have any extended family living in Ohio.

We find the present case is distinguishable from *Wild*. Here, Sarah presented evidence about the financial advantages of her job offer, the benefits presented by its schedule, the present circumstances of the parties' parenting time, and the fact that Sarah has extended family living in the Vancouver area.

The district court also found evidence of aggravating factors that it considered indicative of Sarah's ulterior motive to frustrate Paul's parenting time with Julietta. The court noted Paul's limited phone access while incarcerated and his testimony that he has not received all of his parenting time phone calls, which the court found to be more credible than Sarah's testimony on that issue. The court noted other difficulties, including Julietta's distraction on the phone due to her young age, the fact that Sarah sometimes schedules activities during Paul's parenting time, and the fact that she sometimes does not provide a previously specified book for Paul and Julietta to read together. The court also emphasized the fact that removal from Nebraska would not necessarily protect Julietta from any stigma associated with Paul's wrongdoing.

We acknowledge that the district court found Paul's evidence concerning Sarah's lack of cooperation in facilitating the telephone visits to be credible. However, in our de novo review, we do not find this evidence amounts to an aggravating circumstance sufficient to negate or outweigh the persuasive evidence of Sarah's legitimate reasons for requesting to move from Nebraska. In reaching this conclusion, we find nothing in the record to suggest that the move to the Vancouver area will negatively affect or increase the difficulties inherent in achieving Paul's parenting telephone time. We also note that Paul ultimately agreed that he has received most of his parenting telephone time.

In conclusion, Sarah presented evidence of a firm offer of employment at a hospital in the Vancouver area at a higher rate of compensation than her job in Nebraska, in a type of nursing that Sarah was particularly interested in, and evidence that her extended family lived in the Vancouver area, thus meeting her burden of showing a legitimate reason to leave the state. In our de novo review, we conclude that Sarah's reasons for removal do not reflect an ulterior motive to frustrate Paul's parenting time with Julietta or amount to an aggravating circumstance sufficient to overcome Sarah's legitimate reason to move. Some of the concerns raised by the district court in its analysis of Sarah's reasons for leaving Nebraska relate to whether removal is in Julietta's best interests, and we have addressed those concerns below.

(b) Best Interests of Child

To determine whether removal to another jurisdiction is in the child's best interests, a trial court should consider (1) each parent's motive for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and noncustodial parent when viewed in the light of reasonable visitation. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021).

*(i) Each Parent's Motive*

Although the relocating parent's motive is already examined during the threshold prong in a removal analysis, an appellate court recognizes the wisdom of also weighing the parents' motives in the second prong insofar as they relate to the child's best interests. *Id.* At this stage of analysis, both parents' motives are assessed to determine if one is more compelling than the other. *Id.* The ultimate question in a removal analysis is whether one parent's aim in supporting or opposing the proposed removal is to frustrate or manipulate the other parent. *Id.*

The district court found it evident that Sarah's motive for seeking removal was to frustrate Paul's parenting time with Julietta. In doing so, it stressed the timing of the motion to alter or amend the decree filed by Sarah (8 days after the decree and prior to Paul's surrender to federal custody), as well as the timing of Sarah's present request for removal (within 2 months of the denial of her motion to alter or amend). We disagree that these filings reflect a motive by Sarah to frustrate or manipulate Paul. Sarah's motion to alter or amend sought a substantive alteration of certain provisions of the decree, and the timing of such motions is governed by statute. See Neb. Rev. Stat. § 25-1329 (Reissue 2016) (motion to alter or amend judgment shall be filed no later than 10 days after entry of judgment). We do not find the fact that Sarah's motion to alter or amend the decree was filed before Paul's federal incarceration indicative of an improper motive on Sarah's part. Nor do we attribute an improper motive to the timing of her filing the present request for removal. Sarah was precluded from pursuing her request at the time of the dissolution trial due to a discovery sanction, and a future such request by Sarah was clearly contemplated by the court at the time of the dissolution proceedings.

In general, the evidence shows that both parties care about Julietta's well-being and have legitimate reasons for seeking and opposing her removal to the Vancouver area. Sarah wants to pursue an offer of employment in a location where she will have a lot of family support, both emotional and financial. Paul, who anticipates returning to Nebraska upon his release from prison, wants to preserve his relationship with Julietta, which he contends will be easier in Nebraska in light of various possible restrictions on him following his release. We find no evidence that either parent's motive in requesting or opposing removal was adverse to Julietta's best interests.

*(ii) Enhanced Quality of Life*

There are nine components that may be involved in a trial court's consideration as to whether removal to another jurisdiction would enhance the quality of life of the child and custodial parent: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between

the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). This list should not be misconstrued as setting out a hierarchy of factors. See *Welch v. Peery*, 26 Neb. App. 966, 925 N.W.2d 375 (2019).

### a. Emotional, Physical, and Developmental Needs of Child

The district court found the evidence reflected that Julietta is in good physical health and has no special needs. The court found that the parties did not present evidence of any developmental benefit or detriment for Julietta in either staying in Nebraska or relocating to the Vancouver area and found this factor to weigh neither for nor against removal. Sarah points to enhancements provided by the pay and schedule of the job she has been offered, which enhancements she argues will benefit Julietta's development. We agree with the district court that this factor is neutral.

### b. Child's Opinion or Preference

The district court found that this factor weighed neither for nor against removal because, due to Julietta's young age, her opinion was not offered for the court's consideration. We agree that this factor is neutral.

### c. Enhancement of Income or Employment

The district court acknowledged Sarah's testimony about the extent to which her income may be enhanced by the offered job in the Vancouver area, but it found that this factor weighed against removal, noting that Sarah had not conducted any job search in Nebraska and did not know if any comparable jobs were available in Nebraska. The court also noted that Sarah did not offer evidence of whether any increase in income would be offset by higher cost of living, such as rent or daycare.

We disagree that this factor requires a parent to show that "a similar job was not reasonably available in Nebraska." See *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013) (custodial parent is not required to exhaust all possible job leads locally before securing better position in another state). Sarah presented evidence of enhanced income, some evidence of potential apartment rental costs compared to her rent in Nebraska, and testified that her need for daycare would be greatly reduced. This factor weighs in favor of removal.

### d. Housing or Living Conditions

The district court found no evidence as to whether Sarah's housing or living conditions would be enhanced by the move. It noted that Sarah had not yet signed a lease at the time of trial, and it expressed concern that Sarah planned to move in with a relative prior to securing her own housing. At the time of the removal trial, Sarah was living in a one-bedroom apartment in Omaha and paying rent of $1,020 per month. She intended to rent a two-bedroom apartment in the Vancouver area, which would cost between $1,500 and $1,800 per month. She had submitted an application for one apartment complex and had information about when an opening would be

available. Although Sarah did not present evidence about other living costs, either in Nebraska or in the Vancouver area, in light of the increased income of her offered job and the benefit to Julietta in having her own room, we find this factor weighs at least slightly in favor of removal.

### e. Educational Advantages

The district court noted that Sarah presented no evidence regarding educational advantages in Washington. The court observed that Sarah had not yet chosen a daycare or preschool for Julietta, and it expressed concern that she was not even aware of which school district she would be in if allowed to move. We disagree somewhat with the court's assessment of the evidence. Julietta was not yet old enough to attend school at the time of the relocation trial. Sarah had investigated preschool options, touring several with Julietta in July 2021. She testified that her need for daycare would be minimal given the schedule of her offered job and the availability of family support, although she had placed a deposit to hold a spot for Julietta in a daycare facility. Nonetheless, we agree that this factor is neutral or weighs only slightly in favor of removal.

### f. Relationship Between Child and Each Parent

The district court noted evidence of Sarah's bond with and full-time care for Julietta and Paul's testimony that his relationship with Julietta was somewhat strained. The court also noted evidence of Julietta's demeanor during calls with Paul's mother. The court observed that some of Julietta's differences in demeanor during those calls, as opposed to during calls where Sarah is present, may be due to the limits of Paul's incarceration or due to Sarah's hostility toward Paul, but it found that this factor weighed in favor of removal. We agree.

### g. Child's Ties to Present Community and Extended Family

The district court discussed at length the evidence of Julietta's ties to Paul's family in her present community as well as to those with Sarah's family in the Vancouver area. It concluded that the extent of any relationship Julietta may have with family in Vancouver is speculative. While we do not discount Julietta's relationship with Sarah's family in Vancouver, we agree that she currently has stronger ties to Nebraska and agree that this factor weighs against removal.

### h. Hostilities Between Parents

The district court found evidence of "serious hostilities" between the parties, noting testimony by Sarah that she believed Paul more likely to abuse Julietta because she was conceived through a sperm donor. The court also stated that since entry of the decree, Sarah "has repeatedly petitioned [the court] to interfere with [Paul's] parenting time," has refused to ensure Paul's parenting time by ignoring phone calls and failing to reschedule missed visits, and interferes with parenting time by scheduling activities during phone calls and refusing to provide books. We disagree that the evidence cited by the court shows serious hostilities between the parties, particularly in light of Paul's acknowledgement that at the time of the relocation trial he was receiving his three weekly phone visits and had only missed one phone visit that was not rescheduled. We view the evidence as indicative of the inherent difficulties in successfully scheduling parenting time under the circumstances presented in this case. And, as discussed above, we do not see Sarah's motion to alter or amend the decree or her filing of the request for removal as evidence of an intent to interfere with Paul's parenting time. In our review, we find that any

hostilities that are present will not be exacerbated by allowing Sarah to move to the Vancouver area. This factor is neutral.

### i. Child's Best Interests Are Interwoven With Well-Being of Custodial Parent

In connection with this factor, the district court referenced its analysis of whether Sarah had a legitimate reason to leave Nebraska, stated that her evidence regarding living conditions and employment opportunities was speculative, and found that this factor weighs neither for nor against removal. We disagree. Sarah has a legitimate reason for leaving the state. We also note her testimony that staying in Nebraska "feels very much like [she is] being imprisoned [herself]." She testified further that Paul "destroyed our life" and that she "just want[ed] to go home to [her] family and get supported by them." Sarah believes that she would benefit greatly from having the amount of family support available to her in the Vancouver area. She also felt there were more opportunities for her in her profession there, that she would have more opportunity to grow her cookie business, and that if she was "happy and healthy," that would be best for Julietta as well.

An award of custody is not and should not be a sentence of immobilization for the custodial parent. See, *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014); *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Little v. Little*, 221 Neb. 870, 381 N.W.2d 161 (1986); and *Boll v. Boll*, 219 Neb. 486, 363 N.W.2d 542 (1985).

This factor favors removal.

### j. Summary of Quality of Life Factors

The district court concluded that Sarah did not establish that removal would enhance Julietta's quality of life. In our de novo review, we find that overall, the quality of life factors weigh in favor of removal.

### (iii) Impact on Noncustodial Parent's Visitation

The final consideration in assessing the best interests of the child is what impact removal to another jurisdiction would have on the contact between the child and the noncustodial parent. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). While every move will have some impact, the impact of removal to another jurisdiction is chiefly concerned with the ability of the parent opposing the move to maintain a meaningful parent-child relationship after the move. *Id.* Such assessment must be undertaken in the light of the potential to establish and maintain a reasonable visitation schedule, meaning one that provides a satisfactory basis for preserving and fostering a child's relationship with the nonmoving parent. *Id.* Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in a removal analysis. *Id.*

The district court determined that this factor weighed against removal. It noted the unique circumstances in that Paul's parenting time with Julietta will be limited to phone contact until September 2023 at the earliest. It also noted that his release from prison is already considered a material change in circumstances per the decree. The court stated that Sarah's actions as outlined in its opinion cast "serious doubt" on her ability to encourage a meaningful relationship between Julietta and Paul. It also noted Paul's testimony about the financial burden of traveling to the Vancouver area and the possibility of other limits on his ability to travel, which would negatively impact his relationship with Julietta.

- 15 -

In our de novo review, we conclude that this factor does not weigh against removal. Until Paul is released from prison and chooses to seek modification of parenting time, the outcome of which is certainly speculative, the move to the Vancouver area will not affect his telephone parenting time.

### (c) Did District Court Abuse Its Discretion?

The district court erred in finding that Sarah did not prove a legitimate reason for seeking removal of Julietta from Nebraska to the Vancouver area. In our de novo review, we have found that Julietta's quality of life would be enhanced by the move and the impact on Paul's future parenting time will not be negatively impacted. Overall, we conclude that the district court abused its discretion in denying Sarah's request for removal.

### 3. DISMISSAL WITH PREJUDICE

Sarah asserts that the district court erred in dismissing her amended request for removal with prejudice. Given our resolution of the above assignments of error, we need not address Sarah's final assigned error. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *Kozal v. Snyder*, 312 Neb. 208, 978 N.W.2d 174 (2022).

### VI. CONCLUSION

The district court erred in finding that this case involved a request by a party to modify custody and in requiring Sarah to plead a material change in circumstances in addition to the removal requirements. We further conclude that the record supports finding that Sarah had a legitimate reason for her request for removal and that such would be in the child's best interest. As such, based upon our de novo review of the record, we find that the court abused its discretion in denying Sarah's request for removal. Accordingly, we reverse the order of the district court and remand with instructions to grant Sarah's request for removal.

REVERSED AND REMANDED WITH INSTRUCTIONS.